```
1                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLORADO
2
     Criminal Action No. 11-cr-0355-MSK
3
     UNITED STATES OF AMERICA,
4
          Plaintiff,
5
     vs.
6
     WAUNITA WEINGART,
7    JOHN PHILLIP GALLEGOS, and
     ALOIS CRAIG WEINGART,
8
          Defendants.
9
     -------------------------------------------------------------
10
                           REPORTER'S TRANSCRIPT
11                        Motions Hearing - Volume II

12   -------------------------------------------------------------

13        Proceedings before the HONORABLE MARCIA S. KRIEGER,

14   Judge, United States District Court for the District of

15   Colorado, commencing at 10:49 a.m., on the 27th day of

16   November, 2012, in Courtroom A-901, United States

17   Courthouse, Denver, Colorado.

18

19                 MARY J. GEORGE, FCRR, CRR, RMR
                   901 19th Street, Denver, Colorado 80294
20              Proceedings Reported by Mechanical Stenography
                     Transcription Produced via Computer
21

22

23

24

25
```

1                              **APPEARANCES**

2              LINDA KAUFMAN and MARTHA ANN PALUCH, Assistant

3    U.S. Attorneys, 1225 17th Street, Suite 700, Denver,

4    Colorado, 80202, appearing for the plaintiff.

5              MARTIN ADAM STUART, Attorney at Law, 955 Bannock

6    Street, Suite 200, Denver, Colorado 80204, appearing for the

7    defendant Waunita Weingart.

8              DARLENE ANN BAGLEY, Attorney at Law, 303 16th

9    Street, Suite 200, Denver, Colorado, 80202 and WILLIAM LEWIS

10   TAYLOR, Attorney at Law, 303 16th Street, Suite 200, Denver,

11   Colorado, 80202, appearing for the defendant John Phillip

12   Gallegos.

13             PAULA M. RAY, Attorney at Law, Post Office Box

14   12554, Denver, Colorado 80212-0554, appearing for the

15   defendant Alois Craig Weingart.

16

17                      P R O C E E D I N G S

18        (Proceedings continued at 10:49 a.m.)

19             THE COURT:  We're convened with the assistance of

20   our new court reporter.  Ms. Lindblom was not feeling well.

21   And I apologize for the delay until we could get restaffed

22   for purposes of this hearing.

23             We will be recessing about quarter to 12:00, and I

24   anticipate that my examination will probably continue until

25   about then and then we'll reconvene at 1:30.  And if I have

 1    finished up, then it will be a good time for the attorneys

 2    to step in and complete the examination.

 3                    EXAMINATION (Continued)

 4    BY THE COURT:

 5    Q.    Ms. Chamberlin, I'd like to back up a step or two here.

 6    You've identified, in conjunction with my questions about

 7    the bank records, a number of loans that you examined bank

 8    records for, and you examined file -- loan files for some of

 9    these prior to rendering your opinions, and some you've

10    acquired loan files since.

11                How did you identify these loans as being the ones

12    you should look at?

13    A.    In the beginning, the FBI had a set of loans.  I don't

14    know how many, and I don't recall which ones that prompted

15    them to ask our office to open up an investigation.  So we

16    started with that universe, which if I had to guess, it

17    might have been maybe five loans at the time when we opened

18    it.

19                Then it was kind of a combination of the agent

20    looking at the loan files as he received them, while I was

21    analyzing the bank records.  And I would see deposits which

22    appeared to me to be proceeds for potential loans of the

23    defendants.  So we would go back and forth and he would

24    often call me and say, "Do you have a deposit coming in

25    around this date from this particular lender?"  And I would

1    say yes or no.

2          And if it was no, then we wouldn't bother getting

3    that loan file.  And if it was yes, we would -- we would

4    attempt to get that file.

5          On my hand, I may see a deposit and I would ask

6    him, "Have you -- have you gotten the loan file for this

7    loan yet?"  And he would say yes or no.

8          And if no, then we would attempt to get it.  So it

9    was kind of a back-and-forth between the two of us in

10   identifying the loans.

11         And then as I continued to do the analysis on the

12   lender files, as I would match up loans to the -- on the

13   liability section and the credit reports, we identified a

14   few more that way.  That's kind of how we brought in the 6th

15   Avenue and California loans at that time was based mainly

16   upon my work doing the loan application analysis.

17   Q.   Who was the agent you worked with?

18   A.   Scott Donner.

19   Q.   And did you work consistently with him through this

20   whole time period?

21   A.   Yes.

22   Q.   Was he the person who got the files and then delivered

23   them to you?

24   A.   Yes.

25   Q.   You didn't deal directly with the lenders?

1   A.   No.

2   Q.   You didn't talk to the lenders to find out if they had

3   been paid off or when?

4   A.   No.

5   Q.   Did you double-check the completeness or accuracy of

6   the information that you got from the FBI agent?

7   A.   As -- I don't understand what you mean by the

8   information that I got from him.

9   Q.   Well, you got packets of information from him, bank

10  records and loan files and whatnot.  Did you verify with

11  anyone that these were the accurate records from the people

12  who prepared them?

13  A.   I mean, they were obtained via subpoena.  And so when

14  something comes to me via subpoena, I'm assuming that they

15  came from who we subpoenaed.

16  Q.   Did you prepare the subpoena?

17  A.   No.  Not for the lender records.

18  Q.   Did you see the subpoenas?

19  A.   On occasion, yes.

20  Q.   Did you tell the FBI agent what documents were

21  necessary for your review?

22  A.   The subpoenas would typically ask for the loan file.

23  It wouldn't be a specific listing of documents.  If -- if

24  there was something that I felt should have been in there, I

25  don't believe I ever asked to go back to the lender to see

 1   if they could provide additional information.  I took it as

 2   we asked for the loan file and the payment history and

 3   that's what we received.

 4   Q.   Okay.  Now, you've identified for me this three-step

 5   process that you went through, beginning with reviewing --

 6   review of the bank account records to look at proceeds from

 7   various accounts, and then going to the loan records to see

 8   what was on the HUD-1 and the promissory note and occupancy

 9   records and other things that were in the lender's file from

10   the lender's perspective, and then focusing in on the loan

11   application in order to determine whether the information in

12   each loan application was accurate and complete.

13          Is that the process?  Do I correctly understand the

14   process that you used?

15   A.   Yes.

16   Q.   Okay.  Is there anything I've left out?

17   A.   After -- after the loan analysis, I then concentrated

18   more on the payments, which we really haven't discussed in

19   its entirety.  So it was kind of a process of my analysis of

20   the bank records, which led to looking at the proceeds,

21   which led to looking at the loans.

22          And then once I identified that these loans were

23   still outstanding, I then turned towards looking at the

24   payments.  So it's --

25   Q.   So it circled back, then, to the bank records --

1    A.    Correct.

2    Q.    -- to look at the payments?

3    A.    Correct.

4    Q.    How did you come up with this methodology?

5    A.    The methodology is -- in paper is what the CFE tells me

6    that I should do --

7    Q.    It says start with bank records and then it says go to

8    the loan files?

9    A.    No.  No, it does not.

10   Q.    So how did you decide -- how did you come up with this

11   methodology for review of records?

12   A.    Based upon my experience in working all types of fraud,

13   but, in particular, mortgage fraud cases.  As I said before,

14   I usually start with the analysis of the bank records, since

15   we're dealing with financial crimes, and the following of

16   proceeds.

17   Q.    So this is one of four cases where you have used this

18   same methodology; is that correct?

19   A.    Yes.

20   Q.    Okay.

21   A.    And then based upon what the predication was, which I

22   obtained from the FBI, then that would lead me to looking at

23   the applications.

24   Q.    But you didn't look at the applications until after you

25   had looked at the bank records --

1    A.    Correct.

2    Q.    Yeah.   Now, where in the Fraud Examiner's Manual does

3    it say to start with the bank records and then go look at

4    the loan applications and the HUD-1 and the occupancy

5    records and the payment sheets in order to determine what

6    you were asked to determine here?

7    A.    There is not a standard checklist in the Fraud

8    Examiner's Manual, because each fraud, depending on what it

9    is, can be conducted differently.   So there really isn't a

10   checklist to say this is the step you do first, this is the

11   step you do second.

12         What it does do is give us guidance, as far as bank

13   records for a certified fraud examiner, is probably one of

14   the most important pieces of documentation that we can look

15   at.   So that's --

16   Q.    So the fraud examiner's standards apply to bank

17   records, correct?

18   A.    They apply to bank records, they apply to all sorts of

19   financial records.

20   Q.    But they don't have an over-arching methodology for

21   looking at all of these different records in a particular

22   order.

23   A.    Correct.

24   Q.    And yet this is the same order that you have used in

25   all four of the cases involving mortgage fraud that you

1    worked on, right?

2    A.    Correct.

3    Q.    So why did you use this order?

4    A.    Typically the bank records are what the agents usually

5    get first in a financial case, so it's easier for me to

6    start with those.  Then the lender files, just because of

7    the nature of mortgage fraud, would be the second group of

8    documents that I would look at.

9          And because this was a case where the borrowers

10   may have provided false information to the lenders, in other

11   words, to obtain the loans, that's why I started with

12   looking at the loan applications.

13         Once that was complete, it kind of blossomed from

14   there for me to circle back and look at the payments,

15   because in my mind, I knew these loans had not been paid

16   off -- most of them had not been paid off, so how did they

17   keep them current with the lenders and not raise the

18   lender's suspicion that this wasn't the only loan on these

19   pieces of properties?  And that's why I circled back to look

20   at the payments.

21   Q.    Have you had any training that directs you to proceed

22   in this particular order in what you call a mortgage fraud

23   case?

24   A.    I've had -- I've attended a mortgage fraud seminar

25   about a year ago that was sponsored by the Association of

1    Certified Fraud Examiners.  And they talked about the

2    different types of red flags that you can see when it comes

3    to mortgage fraud, whether it's the borrowers committing it

4    or the lender committing it or the appraiser committing it.

5              It talked about the various things to keep an eye

6    on, but there was never a checklist that says:  Here's the

7    step-by-step process.

8    Q.   Are you aware of any checklist or protocol that is

9    reliably used and consistently used by fraud examiners in

10   mortgage fraud cases?

11   A.   I'm not aware of any checklist that says:  If this is

12   mortgage fraud, here are the things that you look at.

13             It's all based upon certain things of knowing --

14   you need to know what should be expected.  And then when you

15   see that it doesn't, then that kind of leads you to the

16   steps what to look elsewhere for.  If that makes sense.

17   Q.   What about the circumstance that you found yourself in

18   here, where a significant number of the loan transactions

19   you didn't have complete bank records, and some you didn't

20   have loan files?  What are the -- what do certified fraud

21   examiners do when they don't have all the information that

22   they think is something they should review?

23   A.   In those cases, we would look towards things like

24   public records.  So for some of those loans that I did not

25   have a loan file on, I looked at the public records to see

1    if at least I could get a deed of trust to at least tell me

2    what date the loan occurred on, the property that was

3    secured, who the lender was, the amount of the loan, who the

4    borrower was.

5          So that would give me some information regarding

6    those types of loans.  The credit reports for the loans that

7    I did have gave me information about the loans for the files

8    that I did not have in that there would typically be a line

9    on the credit report for a particular borrower that would

10   indicate to me, again, the lender, the amount of the

11   original loan, the month and year of -- the original loan

12   was taken out, and the loan number for that loan, at least

13   at that point in time as of the credit report.

14         That could help me identify that there was a

15   particular loan.  It may not help me identify what the

16   collateral was.  The public record would have to help me

17   with that, or eventually getting the loan file.

18   Q.   Why didn't you go back to the lenders or the banks that

19   had the bank records and ask for more complete records?

20   A.   I know -- I know at the time that we were trying to

21   develop how large the scheme was.  Some of the early loans,

22   like the S-3, S-8, we didn't concentrate a whole bunch of

23   information on.  We were more concerned about more of the

24   current ones.

25         In hindsight, we probably should have gone back

1    sooner other than prior to August 2d of this year, so -- the

2    bank records -- I would go back to the banks if there was

3    something that was incomplete.  And, in fact, prior to

4    indictment, I attempted to get additional copies of checks,

5    but the bank was unable to provide those to us.

6    Q.    That was one bank?

7    A.    It may have been one or two.

8    Q.    Because there are a lot here that you didn't have

9    complete records on.

10   A.    There were three banks that were primarily involved and

11   there were multiple accounts at each bank.  And if I was

12   missing something, I did attempt to get it once I realized,

13   hey, we don't have a copy of a check that I believed to be a

14   mortgage payment.  We did try to do that.

15   Q.    So when you say "we," who are you talking about?

16   A.    I would -- I would draw up a list as far as what checks

17   I would get, and either Agent Donner, or sometimes myself, I

18   would call the custodian who provided the original records

19   to see if they could supplement, or we would issue a new

20   subpoena.

21   Q.    Well, I'm curious, because in our earlier session this

22   morning, I was under the impression that you did not ask for

23   any further information from banks.  And now I'm

24   understanding that you did.  Which is accurate?

25   A.    It -- I did try to get additional information from the

1    banks.   It was the lenders that I did not go back and get --

2    ask for additional information on.

3    Q.    Okay.   But then how did you get these loan files that

4    came in after August if you didn't ask the lenders for more

5    information?

6    A.    We had a trial subpoena out for those -- those files.

7    Q.    Okay.   And when --

8    A.    Since we had a trial date.

9    Q.    -- when you say "we," who's "we"?

10   A.    The U.S. Attorney's Office and the FBI or the IRS would

11   have served the trial subpoena.

12   Q.    Okay.   And when you say "we were investigating," and

13   "we were developing the scope of this scheme," who is the

14   "we" in that statement?

15   A.    The FBI and my -- and the U.S. Attorney's Office.

16   Q.    So what did you understand that your opinions would be

17   used for?

18   A.    At the time prior to indictment, I did not know whether

19   or not any of my information would be used either as a

20   summary witness or as an expert witness.   I know that some

21   of it was used to prepare the indictment, but at that stage

22   I didn't know if I would even testify as a witness.

23   Q.    Did you present this information to the grand jury?

24   A.    I did not, no.

25   Q.    Did the U.S. Attorney's Office present your opinions to

1    the grand jury?

2    A.    My opinions, no.

3    Q.    And when I say "your opinions," you have a number of

4    factual opinions here as to what occurred.  That was not

5    presented to the grand jury?

6    A.    I don't -- I don't know since I did not testify.

7    Q.    But you turned it over to the U.S. Attorney's Office

8    and they did whatever they do with it.

9    A.    Correct.

10   Q.    Does the Fraud Examiner's Manual tell you what data you

11   should review in assessing whether there has been fraud in a

12   mortgage application?

13   A.    The manual doesn't specifically list what should be

14   reviewed.  I received more detailed information from the

15   class that I attended on mortgage fraud.

16   Q.    And what documents did you understand that you should

17   look at?  What data?

18   A.    Well, in particular, to what was purported here would

19   be everything that I did look at:  the loan application, the

20   credit reports, the payment histories, the bank records,

21   servicing letters.  Anything that would help me prove the

22   falsity of what was on the application.

23   Q.    Are there any other records that you did not look at

24   that the course suggested you should look at?

25   A.    One set of records that would be helpful, and typically

1    in a mortgage fraud I would have asked for, would have been

2    the records of the title company who closed the transaction.

3    I did not look at those in this case.

4    Q.    And you didn't order a title analysis of either of

5    these parcels of property to show all of the encumbrances

6    and releases and changes of title, right?

7    A.    No.

8    Q.    Is there a reason why you didn't do that?

9    A.    I don't think I've ever done that before.  And I know

10   that there -- because of the deeds of trust not being

11   recorded at around the time the loan was taken out, I think

12   there would have been a lot of issues for a title company

13   trying to give us a title search, if you will.

14   Q.    You consistently referred to -- and I think we all sort

15   of colloquially referred to mortgage fraud.  What do you

16   understand that term to mean?

17   A.    Mortgage fraud is a fraud that can be conducted by any

18   people within the loan process, whether it be the lender,

19   the borrower, the appraiser, the title company, the

20   settlement agent.  It can happen in a wide variety of ways

21   by a wide variety of people.

22        I know from my experience and my training that

23   regarding when borrowers commit mortgage fraud, typically

24   the way they do it is by misrepresentations on the loan

25   application.  So that is why I started to look at those with

1    the information that I had.

2              I've had other fraud -- mortgage fraud cases where

3    the appraisal was falsified and adjusted, and that's one way

4    that that case was conducted.

5    Q.    And when you referred to mortgage fraud in this case,

6    you're referring to the statements on the loan applications;

7    is that correct?

8    A.    The statements made on the loan applications as well as

9    the title company not paying off the required loan by the

10   lender.

11   Q.    Well, that's part of the scheme.  But what is the

12   representation or omission that's made with regard to

13   failing to pay off something?

14   A.    Well, the lender had instructed the title company to

15   pay off a particular loan.  The title company had a

16   fiduciary duty to do that and they did not, considering that

17   the borrowers in this case were also the title company in

18   many of the loans.

19   Q.    Okay.  And when you say there's a fiduciary duty, from

20   what do you ascertain that fiduciary duty?

21   A.    The training that I've had regarding the title

22   company's role in the loan process.

23   Q.    Okay.  So you just generally assume that it should be

24   paid off?

25   A.    Whatever the lender instructs the proceeds -- to do

1    with the proceeds, that's what the title company is

2    obligated to do.

3    Q.    And if I understand your analysis correctly, you

4    ascertained that from the HUD-1, correct?

5    A.    Correct.

6    Q.    Could you -- or do you have a copy of the Rule 702

7    second amended joint motion?

8    A.    I do.

9    Q.    Okay.  Would you turn to page 3 of that motion, please,

10   and focus in on opinion A1.

11   A.    Yes.

12   Q.    Okay.  Now, I understand that there are three different

13   groupings of opinions here.  Those that are identified as an

14   A opinion are opinions that you have rendered as to false

15   statements or omissions on the loan applications, correct?

16   A.    Correct.

17   Q.    Okay.  And then the B opinions are opinions as to

18   whether loans were paid off as required by the HUD-1; is

19   that right?

20   A.    Correct.

21   Q.    And the opinions that are C opinions are a statement of

22   what you ascertained from the bank records as to what

23   payments were made on what loans.  Right?

24   A.    From what account, yes.

25   Q.    Right.  Okay.  Let's focus in, then, on the A opinions.

1    Opinion A1 concerns a loan of August 27, 2000, made to Craig

2    and Waun Weingart.  And I'm a little curious because I don't

3    have the underlying documentation to refer to.  What do you

4    mean by G-4 Holdings to Flagstar Bank?

5    A.   The promissory note for this loan was between Craig and

6    Waun Weingart and G-4 Holdings, which was one of their

7    companies.  Flagstar Bank was the one that funded the loan,

8    and on the same day as the closing of this loan there was an

9    assignment of deed of trust from G-4 Holdings to Flagstar

10   Bank.  So --

11   Q.   So what does the promissory note show here?  Does it

12   show that Craig and Waun Weingart are the makers of the

13   note, i.e., the borrowers?

14   A.   Yes.

15   Q.   Okay.  And this is purportedly secured by some

16   property.  What property was it to be secured by?

17   A.   7766 Saxeborough.

18   Q.   All right.  And in whose name was title held on 7766

19   Saxeborough Drive at the time that this loan was made?

20   A.   Craig and Waun Weingart.

21   Q.   Okay.  So how does G-4 Holdings fit into this

22   transaction?  We have the borrowers that are Craig and Waun

23   Weingart, they own property which is the collateral for this

24   loan.  So where does G-4 Holdings fit into this transaction?

25   A.   G-4 Holdings on the note is the lender.  They, in turn,

1      on the same day as the closing, assigned their interest to

2      Flagstar Bank.  And Flagstar Bank was the one that wired the

3      proceeds to fund this loan.

4              G-4 was -- I forget the name -- they had a special

5      relationship with Flagstar Bank as a -- as a mortgage

6      broker, and so they were the ones on the promissory note.

7      I . . .

8      Q.   They were the payee on the note?

9      A.   Yes.

10     Q.   And so the loan application is by Craig and Waun

11     Weingart to G-4 Holdings?

12     A.   The loan application was signed by Craig and Waun

13     Weingart.

14     Q.   Asking for who to -- whom to make the loan?

15     A.   I'd have to look at the application.

16     Q.   Would you like to refresh your recollection?

17     A.   I would.

18     Q.   All right.  What document would refresh your

19     recollection?

20            MS. KAUFMAN:  I believe it's Exhibit 601.

21            THE COURT:  Ms. Glover.

22            MS. KAUFMAN:  In connection with that, 604 and 605.

23            THE WITNESS:  Could I also have the HUD-1 for this

24     loan, please.

25            MS. KAUFMAN:  That would be Exhibit 603.

1            THE WITNESS:  So on the HUD-1 settlement statement,

2    the lender is listed as Flagstar Bank.  That's on

3    Exhibit 603.  On the promissory note, which is Exhibit 604,

4    the lender is listed as G-4 Holding Company.  Exhibit 605 is

5    the assignment of the deed of trust or mortgage deed that

6    assigns the note and the deed from G-4 to Flagstar Bank on

7    the date of the closing.

8    Q.   The application?

9    A.   The application is signed by Craig and Waun Weingart

10   and the name and address, interviewer's employer, is G-4

11   Holding, and the interviewer is listed as John Gallegos.

12   Q.   Is there, on the loan application, a designation at the

13   top of the loan application as to who the lender is?

14   A.   I do not see one.  It has a lender case number.

15   Q.   So you don't know who the borrowers made application

16   to.

17   A.   Based upon the application, the borrowers made the

18   application to G-4 Holdings.

19   Q.   Okay.  And when you talk about your opinions here in

20   A1, you're talking about the application made to G-4

21   Holdings, right?

22   A.   Correct.

23   Q.   Okay.  And G-4 Holdings is owned by whom?

24   A.   It is a combination of one of our -- a combination of

25   our defendants.  I don't recall specifically.  I believe

1    there may be an exhibit that we may have marked that would

2    indicate it.

3    Q.    Okay.  So your belief is that G-4 Holdings is an entity

4    owned and controlled by some or all of the defendants; is

5    that fair?

6    A.    Correct.

7    Q.    Did you analyze the ownership of G-4 Holdings in

8    reaching an opinion as to the representations made here?

9    A.    I did review the documents filed with the Secretary of

10   State regarding G-4 Holdings, but it was more in terms of

11   the overall investigation, not specifically to form this

12   opinion.

13   Q.    Okay.  So, in essence, your opinion is pertinent to an

14   application made by Craig and Waun Weingart to G-4 Holdings.

15   Fair?

16   A.    Correct.

17   Q.    Okay.  Apparently G-4 Holdings, regardless of who owns

18   it, approved that application and obtained funding from

19   Flagstar Bank in order to fund, correct?

20   A.    Flagstar Bank, yes, funded this loan.

21   Q.    But you don't have the documents between G-4 Holdings

22   and Flagstar Bank, right?

23   A.    I don't believe so.

24   Q.    Okay.  So you don't know what G-4 Holdings represented

25   to Flagstar Bank, correct?

1    A.    I know that G-4 Holdings -- the application to G-4

2    Holdings was in the Flagstar loan file because that's what

3    we received from Flagstar.

4    Q.    Okay.  So you know the application was there, but you

5    don't know whatever else might have been transmitted by G-4

6    Holdings to Flagstar Bank?

7    A.    Correct.

8    Q.    And you didn't talk with Flagstar Bank.

9    A.    I did not talk with Flagstar Bank.

10   Q.    Looking at the application, I understand your opinion

11   to be actually a couple of opinions.  First, that the

12   statement on the loan application relating a liability to

13   Loan Works, secured by a construction project for 24 units,

14   was a false representation; is that correct?

15   A.    Can you say that again, please?

16   Q.    I understand your first opinion, in essence, to be that

17   the representation on the loan application that the

18   liability to Loan Works, secured by the construction project

19   for 24 units, was a false representation.

20   A.    Correct.

21   Q.    Okay.  And your second opinion to be that there was an

22   omission that was materially false because the application

23   did not reflect a loan that Craig and Waun Weingart had

24   obtained from Jefferson Mortgage Group that was outstanding

25   as a liability; is that right?

1    A.    Correct.

2    Q.    Okay.  So with regard to this application, your opinion

3    is that there is a false statement and an omission.

4    A.    Correct.

5    Q.    And you reached those conclusions using this

6    methodology that you described a few minutes ago.

7    A.    Yes.

8    Q.    Now, as to that second opinion, you say that it is --

9    that there is an omission in that the loan should have been

10   reflected as a liability on the application and the

11   property, 7766 Saxeborough, should have been listed on the

12   schedule of real estate owned.  Is that correct?  Do I

13   understand that correctly?

14   A.    Correct.

15   Q.    The property, 7766 Saxeborough, was not listed as any

16   property owned by the defendants on the application?

17   A.    No.  It was, because it was the loan being refinanced,

18   so it was listed as a property with one liability.  It did

19   not show the other liability that I said was omitted.

20   Q.    So what really is happening here is it didn't show the

21   lien from the loan, the lien that secured the loan to

22   Jefferson Mortgage Group, right?

23   A.    Correct.

24   Q.    Okay.  Now, in formulating this opinion, did you

25   determine that there was a deed of trust recorded in the

1    real estate records for 7766 Saxeborough securing the loan

2    to Jefferson Mortgage Group?

3    A.   I don't recall if I reviewed the recorded deed of trust

4    for that -- for that loan to Jefferson Mortgage, but I did

5    review the Jefferson Mortgage loan file, which had a copy of

6    the deed of trust.  It may or may not have been recorded.

7         So I didn't, as I said before, even though I did

8    review the clerk and recorder's documents for the deeds of

9    trust, I was like the lender, if you will, to say, We've had

10   a deed of trust signed and that property is the collateral

11   for this loan.

12        The lenders didn't always have a copy of the

13   recorded deed of trust in their files; they sometimes only

14   had what was signed at closing.

15   Q.   And you didn't make any distinction between whether

16   something was recorded or not.

17   A.   I did not.

18   Q.   Let's go to opinion A2.  This pertains to a loan dated

19   October 12th, 2000, obtained by Craig and Waun Weingart,

20   from Option One Mortgage.  And I understand that you've

21   expressed three opinions with regard to that application.

22   A.   Yes.

23   Q.   I understand that in opinion A, you again are saying

24   what you said with regard to opinion A1a, that there was a

25   false representation with regard to the listing of a

1    liability in the liability section of the loan application.
2    Correct?
3    A.    Which was linked to a -- to a false address that was
4    not the address pledged as collateral for that liability,
5    yes.
6    Q.    Okay.  And that B and C are omissions which you believe
7    should have been included on this application; is that
8    right?
9    A.    Correct.
10   Q.    And if I understand these opinions correctly, both A1
11   and A2, your assumption is that on the loan application,
12   Craig and Waun Weingart were obligated to disclose all debts
13   that they had and all collateral securing those debts; is
14   that correct?
15   A.    All debts that were collateralized by Saxeborough,
16   which was the loan -- which was the piece of property that
17   they were requesting to be refinanced.
18   Q.    Okay.  So they didn't have to disclose other debts that
19   weren't secured by Saxeborough?
20   A.    There were -- they were required to list their
21   financial position to the lender accurately.  I did not look
22   at what were all the debts that they should have listed.  I
23   focused on which debts related to the properties that were
24   showing on these loan applications.
25              So I didn't -- it didn't matter to me if they left

1   off a MasterCard bill, for example, but I would think, as

2   the lender, they would -- the lender would want an accurate

3   representation of their financial position at the time of

4   the loan.

5   Q.   And that's because you tailored your analysis to the

6   mortgage fraud that had been described to you by the FBI

7   agent when you began this investigation; is that right?

8   A.   Yes.

9   Q.   Could you turn to page 64.  These are the B opinions.

10  A.   Yes.

11  Q.   And I want to make sure I correctly understand what the

12  nature of the opinions is and how you reached these

13  opinions.  You've described here these opinions as being

14  opinions related to whether loan proceeds from each

15  refinancing of Saxeborough and Lost Angel were used to

16  promptly pay off the prior outstanding mortgage as required

17  by the lender.

18          Now, I understand from your prior testimony that

19  really what we're talking about here are HUD-1 requirements;

20  is that right?

21  A.   Correct.

22  Q.   And so each of these opinions, B1, et cetera, involve a

23  study of your review of the HUD-1 to determine what loans

24  were required to be paid off.  And then looking to see

25  whether, based on the records you had, the loan was paid off

1    from the loan proceeds.  Correct?

2    A.   Right.

3    Q.   Now, in making the determination as to what's on the

4    HUD-1, you just looked at the HUD-1, right?

5    A.   The HUD-1, in conjunction with any payoff statement

6    that was submitted to the lender, and/or the loan

7    application that listed which loan was being refinanced.

8    Q.   Okay.  But you made the determine -- if there was

9    disagreements among those documents, you went by the HUD-1,

10   right?

11   A.   I went by the HUD-1, but there wasn't ever a time that

12   they disagreed.

13   Q.   Okay.  So --

14   A.   So --

15   Q.   So you didn't need to refer to the other documents, you

16   could simply look at the HUD-1.

17   A.   No, I would need to look at the other documents because

18   the HUD-1 typically only listed the lender to be paid off.

19   It did not indicate the loan -- the actual loan number --

20   Q.   Okay.

21   A.   -- and that information I would have received from

22   either the payoff statement or the loan application.

23   Q.   Okay.  For all of the loans that you've expressed

24   opinions here, did you have a HUD-1?

25   A.   I believe so.

1   Q.   And for all of these opinions that you expressed here

2   as B opinions, did you have a payoff statement?

3   A.   No.

4   Q.   So if the payoff statement is necessary to form the

5   opinion, how could you form the opinion without the payoff

6   statement?

7   A.   Because I could rely on the loan application, because

8   the loan application would list only one loan for

9   Saxeborough or Lost Angel to be the one to be refinanced;

10   and the loan application would list in the liability section

11   the account number, the loan identification number of the

12   loan.  And if for some reason the loan identification number

13   was not listed on the liability section of the application,

14   I could look at the credit report as well, which would give

15   me the loan identification number for the loan requested to

16   be paid off.

17   Q.   Okay.  So that told you there was a loan.  But it

18   doesn't tell you whether that loan was paid off before the

19   closing, does it?  In other words, if you don't have a

20   payoff statement, you don't know what's owed on that loan as

21   of the time of the closing, right?

22   A.   Other than from the HUD-1.  The HUD-1 would list the

23   amount that the lender is saying, "Please pay off this

24   loan."

25   Q.   Well, I thought I just understood you to say that's why

1    you needed the payoff statement was to quantify the amount.

2    A.    I didn't quant- -- I didn't need the payoff statement

3    to quantify the amount.

4    Q.    So why did you need the payoff statement?

5    A.    I needed the payoff statement to identify the loan

6    number that was being requested to be paid off.

7    Q.    Okay.  So what I understand, then, is if you don't have

8    the payoff statement to tell you the loan number, you can

9    guess at what the loan number is by looking at the loan

10   application, if it's referred to there, or by looking at the

11   credit report that might have the loan number there?

12   A.    It wouldn't be a guess.  It would be listed either in

13   the application, but most definitely listed on the credit

14   report.

15   Q.    I understand that most of these loans were funded

16   through three or four or five banks; is that right?

17   A.    You mean are lenders who funded the -- oh, there was

18   definitely more than five.

19   Q.    Okay.  Were there more -- were there any lenders who

20   funded more than one loan?

21   A.    There were lenders that funded more than one loan for

22   two different pieces of property.  So, for example, Chase

23   Manhattan Mortgage funded a loan for Saxeborough and they

24   funded a loan for Lost Angel.  I don't recall -- I could

25   possibly look at an exhibit to see if a lender may have

1    funded a Saxeborough loan early in time and then funded

2    another Saxeborough loan later in time.  I don't recall if

3    that happened.

4    Q.    So going hypothetically to a transaction where you

5    don't have a loan payoff statement, so you don't have the

6    loan number on the payoff statement, and you're relying on

7    whatever loan information is listed on the application, and

8    you then want to have certainty as to whether a particular

9    loan was paid off or not, without the loan payoff statement

10   how did you verify that you had the right loan number?

11   A.    The loan being requested to be paid off would be the

12   loan -- the only loan on the loan application for

13   Saxeborough, for example.  The credit report would list that

14   same liability and that credit report would have that loan

15   identification number on there as well.  So between the

16   application showing one loan to be paid off for Saxeborough

17   and linking the liability for that -- for Saxeborough that's

18   listed on the loan app, to the credit report debt, that

19   would be represented to the lender to be the debt for

20   Saxeborough, that would tell me the loan identification

21   number.

22        Then I could tell, based upon getting the lender

23   files for that loan that's being requested to be paid off,

24   either the payment history that would show that it would be

25   paid off, or through my analysis of the bank records showing

64

1    the proceeds came in, there was no payoff for that loan from

2    that account, or from any account, during that time period

3    that the refinancing occurred.

4    Q.    Do you ever check with the lender to see if the lender

5    was paid off and on what date the lender was paid off?

6    A.    Through the payment histories that they provided.

7    Q.    But you didn't have payment histories for all of these

8    loans.  So where you didn't have payment histories, did you

9    contact the lender and find out if they were paid off and,

10   if so, when they were paid off?

11   A.    No, I did not.

12            THE COURT:    Okay.  I think that's all the questions

13   that I have.  We're about five minutes short of when I

14   thought I was going to be finished so we'll take our recess

15   right now.  We'll reconvene at 1:30.  And because the

16   Government has the burden of proof with regard to the

17   establishment of the foundational requirements under 702 for

18   its witness, we will begin with the examination by the

19   Government.

20            I ask you not to be repetitive as to the areas that

21   I've inquired into but, of course, you're free to further

22   explore those areas if I didn't go deep enough.

23            All right.  Thank you very much.  I'll see you at

24   1:30.

25            (Recess taken 11:40 a.m.)

```
 1                      AFTERNOON SESSION
 2           (Proceedings continued at 1:42 p.m.)
 3               THE COURT:  Ms. Kaufman.
 4               MS. KAUFMAN:  Yes, thank you.
 5                      DIRECT EXAMINATION
 6    BY MS. KAUFMAN:
 7    Q.   Good afternoon, Ms. Chamberlin.
 8    A.   Good afternoon.
 9               THE COURT:  Ms. Kaufman, you'll need to pull that
10    microphone toward you.  You're kind of soft.
11               MS. KAUFMAN:  Thank you.
12               THE COURT:  Thank you.
13               MS. KAUFMAN:  Is that better?
14               THE COURT:  That's better.
15               MS. KAUFMAN:  Good.  Thank you.
16    BY MS. KAUFMAN:
17    Q.   Ms. Chamberlin, in this case, you've articulated
18    numerous opinions, correct?
19    A.   Yes.
20    Q.   And those -- have those been set forth in writing in
21    the parties' second amendment -- amended joint motion under
22    Federal Rule of Evidence 702?
23               THE COURT:  Ms. Kaufman, I know that they've been
24    set forth in that document.  We've referred to that
25    document.  You don't need to lay foundation for that
```

1  document or those opinions.  I understand those to be the

2  opinions of this witness.

3          MS. KAUFMAN:  Very well.

4  BY MS. KAUFMAN:

5  Q.  Do the opinions, particularly those relating to part A,

6  which are those relating to the loan applications, the

7  relationships between the various parts of the loan

8  applications, do those stated opinions include a conclusion

9  on your part, as an expert, that anyone made a false

10  statement, or they otherwise phrased?

11  A.  That a specific person made --

12  Q.  No.  That a false statement was made.  Do those

13  opinions include that as part of your opinion to be offered

14  in trial?

15  A.  No.

16  Q.  Okay.  Do those opinions include an assertion on your

17  part that anyone omitted information from any -- anyone in

18  particular omitted information?

19  A.  That anyone omitted information, no.

20  Q.  Are you simply stating that that information was not

21  presented?

22  A.  That liability was not listed on the loan

23  application.

24  Q.  All right.  Is it your understanding that the precise

25  opinions that are set forth in document 160 would be the

1    opinions elicited from you at trial, should we be permitted

2    to do so after this hearing?

3    A.    Yes.

4    Q.    When you -- you said that you work for the United

5    States Attorney's Office and that when you got this case, it

6    was brought to you by FBI Agent Scott Donner?

7    A.    Correct.

8    Q.    And had it at that time already been approved for

9    opening as a matter within the United States Attorney's

10   Office?

11   A.    To my knowledge, yes.

12   Q.    And is it your understanding whether or not a

13   supervisor within the economic crimes unit would have to

14   approve that opening of the case for further investigation?

15   A.    Correct.

16   Q.    Referring you to what has been called document 161,

17   this is, in fact, the Government's proffer relating to the

18   methodology used by you, are you familiar with that

19   document?

20   A.    I am.

21   Q.    And does that accurately set forth the methodology that

22   you used in this case?

23   A.    Yes.

24   Q.    Did you participate in drafting the -- that document,

25   and, specifically, pages 1 through 21, which describe

1    methodology?

2    A.    Yes.

3    Q.    Did you have an opportunity, if anything in that

4    document was inaccurate, to request that it be changed?

5    A.    Yes.

6    Q.    And was it changed if it was inaccurate in your view?

7    A.    Yes.

8    Q.    And so are you satisfied that that is an accurate

9    statement of your -- the methodology used in this case?

10   A.    It is.

11   Q.    Okay.  That document, as you may recall, discusses the

12   fraud theory approach.

13   A.    Yes.

14   Q.    What is the fraud theory approach?

15   A.    The fraud theory approach is the approach endorsed by

16   the Association of Certified Fraud Examiners for

17   investigating fraud.

18   Q.    I would have you look at Exhibits, please, 6, 7, and 8.

19   A.    Yes.

20   Q.    Can you identify Exhibit 6, please.

21   A.    Exhibit 6 is the introduction to the 2012 Fraud

22   Examiner's Manual.

23         MS. KAUFMAN:  And, Your Honor, I would ask for some

24   guidance here.  I've been told one or two things about how

25   the Court likes to proceed with exhibits at such hearings.

1    Does the Court require a formal offering of this as admitted

2    into evidence at this hearing?

3              THE COURT:  You can do whatever you like.

4              MS. KAUFMAN:  I would move for admission of this

5    into evidence.

6              THE COURT:  I will receive the exhibit.  The Rules

7    of Evidence do not apply in this hearing.

8              MS. KAUFMAN:  Very well.

9              THE COURT:  So we're making only a record as to

10   what you want the Court to consider.  I'll consider anything

11   you submit.

12             MS. KAUFMAN:  Very well.

13        (Plaintiff's Exhibit 6 was received into evidence.)

14   BY MS. KAUFMAN:

15   Q.   Ms. Chamberlin, does this document, specifically at

16   page I-7, I believe, I-6 and 7, refer to the fraud theory

17   approach and the methodology that you described in document

18   160?

19   A.   It does.

20   Q.   This morning you were asked some questions about

21   information that Agent Donner gave you as you were newly

22   assigned to begin investigating the case.  And how, if at

23   all, would that presenting to you of information that he had

24   at the beginning of the case fit into your application of

25   the fraud theory approach?

1    A.    Well, the information that Agent Donner gave to me in

2    the very beginning would be part of my predication, along

3    with the opening of the case by the United States Attorney's

4    Office.  And what little information as far as names would

5    be part of the available data that I knew, at least names of

6    companies and individuals as to who I'd be looking for.

7    Q.    All right.  Did you then follow the steps as stated

8    here, and as stated in document 160, relating to analyzing

9    data, creating hypothesis in this case?

10   A.    Yes.

11   Q.    Did you also test the hypothesis and amend and refine

12   the hypothesis if necessary?

13   A.    Yes.

14   Q.    Who created the -- you -- have you described the

15   hypotheses that you came up with the proffer that --

16   A.    Yes.

17   Q.    Who created those?  Was that you or did someone just

18   tell you what a -- the hypothesis was?

19   A.    No, it was me.

20   Q.    How did you know -- for example, talking about topic A,

21   which is the loan application topic -- how did you go about

22   coming up with that hypothesis based on this approach?

23   A.    Well, based upon the available data that I had, which

24   included what Agent Donner told me in the beginning, along

25   with the bank records that I had -- or was in the process of

1    analyzing, I knew that there were certain loans whereby

2    fraud may have been committed in obtaining those loans.

3         So when -- regarding topic A, I first knew what I

4    would expect to see would be the relationship among the

5    liabilities on the loan application to the addresses listed

6    on the schedule of real estate owned on the application, as

7    well as the debts listed on the credit report.

8    Q.   When you say you "expect to see," from where do you get

9    that expectation?

10   A.   Based upon my training and experience in investigating

11   mortgage fraud, as well as my personal experiences in buying

12   pieces of property and having to fill out applications and

13   credit reports.

14   Q.   So when you say you would expect to see certain things

15   in examining these documents, are you talking about if there

16   is no fraud, that this would be -- in the normal course of

17   events, you would expect to see those things?

18   A.   Correct.  If it was a normal application and a normal

19   loan process, those three things would have a relationship

20   and would correspond to one another.

21   Q.   And so what was your hypothesis to start with for part

22   A?

23   A.   My hypothesis to start with was that the liabilities

24   listed on the credit report -- or the liabilities listed in

25   the application corresponded to the schedule of real estate

1    owned address and that it was represented that that

2    liability was for that piece of property listed on the

3    schedule of real estate owned.

4    Q.    And is that expectation based on what you would expect

5    to see were there no fraud?

6    A.    Correct.

7    Q.    Okay.  Were you aware at the time, at the outset,

8    whether or not addresses were listed in the liabilities

9    section of the applications?

10   A.    I would expect to go see addresses listed in the

11   schedule of real estate owned.

12   Q.    The question was:  Would you expect to see addresses

13   listed in the liabilities section of the application?

14   A.    In the liabilities, no.

15   Q.    Okay.  Would you expect to see them in the schedule of

16   real estate owned?

17   A.    Yes.

18   Q.    Would you also expect to see in the schedule of real

19   estate owned, not only an approximate valuation of the

20   property, but also an amount owed on any debt on that

21   property, as well as a monthly payment owed on the debt on

22   that property?

23   A.    Yes.

24   Q.    Is the -- is, typically, in the -- is the schedule of

25   real estate owned typically the only place on a loan

1   application where you would see a specific street address

2   related, linked, to a debt?

3   A.   Other than the first page of the loan application where

4   it would list an existing debt and the property being

5   refinanced, in the case of a refinance, the only place --

6   the only other place I would expect to see a list of

7   properties would be the schedule of real estate owned.

8   Q.   And so would you expect to see, then, that the numbers,

9   that being the total liability on the different liabilities

10   listed on the liability section, would correspond to the

11   liabilities on particular addresses listed on the schedule

12   of real estate owned?

13   A.   Yes.

14   Q.   And, similarly, if the liabilities section of the loan

15   application gave a monthly payment -- would it give a

16   monthly payment?

17   A.   It typically would.

18   Q.   Typically would?  Would you expect in a nonfraud

19   situation, that that monthly payment would also correspond

20   to the monthly payment on the schedule of real estate owned?

21   A.   It would.

22   Q.   Now, in your analysis, you've said that you also

23   examined the credit report.  What would you expect, based on

24   your experience and training in this area, to see in a

25   nonfraud situation on a credit report of the same

 1    application?

 2    A.    The credit report would have the -- typically the same

 3    lender's name that would be listed on the liabilities

 4    section of the application; it would have the outstanding

 5    principal balance that would be listed in both the

 6    liabilities section and the schedule of real estate owned;

 7    it would list a monthly payment that would correspond to the

 8    same liability and the same piece of property under the

 9    schedule of real estate owned; it would also list the

10    account number of the loan; and it would also list the

11    opening year and month of the loan when it was originally

12    taken out; as well as the original balance -- principal

13    balance of the loan when it was originally taken out.

14    Q.    What information would be on the -- would you expect to

15    see on the schedule of real estate owned that you would not

16    expect to see on the credit report?

17    A.    The address for the property secured as collateral.

18    Q.    In your topic A, you said you examined the

19    interrelationships among those three things.  Did you

20    expect, then, in a nonfraud situation to interrelate in that

21    they corresponded?  And if so, how?

22    A.    I would expect them to correlate in that the

23    liability -- the liability that is listed, the outstanding

24    principal balance would match what's listed on the schedule

25    of real estate owned and the debt on the credit report.  I

1    would expect the monthly payment to correspond to what's

2    listed under the schedule of real estate owned and on the

3    credit report.  I would expect the lender name and account

4    number to correspond to what's listed on the debt of the

5    credit report.

6    Q.    And when you examined the applications in this case,

7    did you see that they appeared to correspond?

8    A.    They did appear to correspond, yes.

9    Q.    Those three areas that you've just described?

10   A.    Yes.

11   Q.    And is that what you would expect to see if there were

12   no fraud?

13   A.    Yes.

14   Q.    Now, what other piece or pieces of information did you

15   then bring into this analysis of interrelationships?

16   A.    I brought in the knowledge that I had regarding my

17   universe of loans, as far as looking at the deeds of trust

18   and notes and loan files of the other loans that were not

19   being refinanced, and knew that particular loans were taken

20   out prior to the loan being refinanced, and that either

21   Saxeborough or Lost Angel were the properties pledged as

22   collateral for those loans.

23        And I started to create a list of the loan numbers

24   for each of the loans so I could look at each one instead of

25   digging through the same lender files over and over again.

1    Q.    Okay.  Let's stop there.  You've said a lot.  You said

2    you had a universe of loans.  Are you talking about -- when

3    you say that, you had lenders' files or files you had

4    received from lenders?

5    A.    Correct.

6    Q.    And what is the process -- what was the process in this

7    case through which you at the United States Attorney's

8    Office or the United States Attorney's Office, itself,

9    obtained the lenders' files?  What process did it use to get

10   those files?

11   A.    As I explained earlier, that as I was looking at the

12   bank records --

13   Q.    Let me ask the question again.

14         I'm not asking what you did.  I'm asking at the

15   United States Attorney's Office in this case, when we wanted

16   to get a lender's file delivered to the office, how did we

17   go about doing that?

18   A.    A grand jury subpoena would be drawn up and issued and

19   served on the lender.

20   Q.    Okay.  And who typically serves the grand jury

21   subpoena?

22   A.    The FBI agents.

23   Q.    Okay.

24   A.    Or the IRS agents, depending on who was involved.

25   Q.    All right.  And where, then, are the documents from the

1   lenders delivered?

2   A.   They're sent directly to the grand jury clerk in our

3   office.

4   Q.   Who is that?

5   A.   Charlie Seeton.

6   Q.   And does she have her own office, just for this

7   purpose?

8   A.   She does.  Yes.

9   Q.   And are you -- are you familiar with what she generally

10  does with those documents as soon as she gets them?

11  A.   She -- I am familiar with it, yes.

12  Q.   What does she do?

13  A.   She would log in the return of the documents.  And when

14  the grand jury sits, she will take all the documents that

15  she receives over to the grand jury to be logged in by them.

16  And then once they're logged in, they come back and she logs

17  in that they've been stamped in by the grand jury and then

18  they're distributed to each U.S. Attorney to then pass on to

19  their agents.

20  Q.   All right.  And so when you obtained lenders' files in

21  this case, or documents from lenders, from -- would you

22  receive it through that process?

23  A.   Yes.

24  Q.   Okay.  And then are -- are -- are those documents kept

25  intact throughout this process of the investigation?

1  A.   To my understanding, yes.

2  Q.   Are they logged and filed and kept intact?

3  A.   Yes.

4  Q.   And are those the lenders' records that you used, and

5  that you relied on, in performing your analysis here?

6  A.   Yes.

7  Q.   Similarly, while we're on it, with the bank records,

8  what is the process by which United States Attorney's Office

9  in this case obtained bank records that you reviewed?

10  A.   It would be the same process in that someone, either

11  the agent on the case -- the agents on the case would write

12  up a grand jury subpoena, ask that one be issued.  It gets

13  served by the agents on the bank.  The bank delivers the

14  records to Charlie, Charlie logs them in.  They go to the

15  grand jury when the grand jury meets, same process.

16  Q.   Okay.  Then they come back to the United States

17  attorney dealing with the case?

18  A.   Correct.

19  Q.   And that person would give them to you or whoever

20  needed to work on them?

21  A.   Yes.

22  Q.   And is that how you obtained them in this case?

23  A.   Yes.

24  Q.   You indicated -- you refer to a universe of loans.  So

25  when you say you were aware of other loans and you are aware

1    of when they were taken out, you know, when they were

2    created, are you looking at those files to determine that

3    information?

4    A.    Yes.   Those files or the public records, one of the

5    two.

6    Q.    Okay.  And in those files, was there typically a note

7    that had a date --

8    A.    Yes.

9    Q.    -- and so on?

10   A.    Yes.

11   Q.    And as this investigation proceeded, did you obtain

12   more and more files, as you indicated this morning?

13   A.    Yes.

14   Q.    Would you obtain clues as to where -- what new -- what

15   other loans might be out there by looking at the bank

16   records?

17   A.    Yes.

18   Q.    How?

19   A.    I would see -- typically see a deposit come into one of

20   the bank accounts that would be in an amount that would be

21   fairly significant in the 300-, $400,000 range.  And

22   oftentimes there would be some type of notation on the wire

23   transfer that would indicate to me that it could potentially

24   be one of our suspects' loans.

25   Q.    And so how would that relate to getting a loan file

1     from a lender?

2     A.    I would then contact Agent Donner to say, "Have we

3     received this file for a loan that happened on or about a

4     particular date, in this rough dollar range, from this

5     lender?"

6           If he said no, I said, "Well, there's a potential

7     that this could be one of our loans."

8     Q.    And then what would be requested?

9     A.    Agent Donner would request the entire loan file from

10    the lender.

11    Q.    Well, would he request it or what process would he go

12    through to get it?

13    A.    He would complete a grand jury subpoena request and

14    fill out the information and it would come to you to be

15    approved.

16    Q.    So the same process again.

17    A.    Correct.

18    Q.    Back to topic A.  When you then compared the three

19    areas that you've described in the -- two areas on the loan

20    application plus the credit report, you've indicated that

21    those three areas appear to correspond.

22    A.    Right.

23    Q.    And you then compared that information to information

24    from the loan files that you had been gathering, correct?

25    A.    Correct.

1    Q.    And absent fraud, what would you have expected to see

2    as you indicated in your proffer of a methodology?  What

3    would you have expected to see?

4    A.    What I would have expected to see was that those three

5    pieces of information would correspond to each other based

6    upon the lender name, account number, outstanding principal

7    balance, mortgage amount, and that the property listed as

8    the address for that liability was actually the property

9    that was pledged as collateral on the deed of trust for that

10   loan.

11   Q.    Now, when you say "the property listed with that

12   liability," where on the application is that particular

13   property address listed again?

14   A.    Only on the schedule of real estate owned.

15   Q.    Okay.  So now you had -- could you call them known

16   loans?

17   A.    Yes.

18   Q.    Okay.  So you know that loan existed.

19   A.    Yes.

20   Q.    When you say that there -- it would -- there was

21   property pledged as collateral, were there deeds of trust in

22   which our suspects at the time were verbally pledging to

23   have collat- -- collateral to the lenders?

24   A.    The addresses were listed on the deeds of trust, yes.

25   Q.    And is that the basis on which you concluded that this

1    lender believed that he was going to have this collateral to

2    secure the loan?

3    A.    Yes.

4    Q.    Did you also observe, within the lender's files, title

5    commitment policies -- or title commitments?

6    A.    Yes.

7    Q.    And some title policies?

8    A.    Yes.

9    Q.    And was it a stated condition on the title commitment

10   that a particular loan would be paid off as a condition?

11   A.    Yes.

12   Q.    Was the -- did you observe whether or not the name of

13   the -- you indicated earlier part of the predication was

14   that two of the title companies controlled by one or more of

15   the defendants, those being Colorado County Community Title,

16   or Real Estate Title, initially, were used in the closing of

17   these loans.

18   A.    Yes.

19   Q.    And where did you see that?

20   A.    On the HUD-1 settlement statements, typically.

21   Q.    And were those entities typically also involved in the

22   title commitments within the loans?

23   A.    Yes.

24   Q.    Let's look at -- excuse me for skipping around, but we

25   looked at Exhibit 6, which I've brought to your attention.

1    I would also like to bring to your attention Exhibit 7,

2    which is another document.

3            Could you describe that for the Court, please.

4    A.    Exhibit 7 is portions of the 2012 Fraud Examiner's

5    Manual.   The first page being the table of contents for the

6    investigative section of the manual and the subsequent pages

7    relating to tracing illicit transactions.

8    Q.    Is this an example of information that you received

9    through the Association of Fraud Examiners that discusses

10   what information would be recommended that a certified fraud

11   examiner use in an investigation related to mortgage fraud?

12   A.    Yes.

13   Q.    And what is -- for example, does it talk about loan

14   records, generally at page 3?

15   A.    Pages 3 and 4.

16   Q.    Is that consistent with what you were doing, that is,

17   obtaining the loan records from the lenders through the

18   grand jury process?

19   A.    Yes.

20   Q.    And does this also -- for example, also relate --

21   describe something called a liability ledger?

22   A.    It does.

23   Q.    And are you also a CPA?

24   A.    I am.

25   Q.    How long have you been a CPA?

1    A.    Since 1991.

2    Q.    This describes a liability ledger.  What is a liability

3    ledger?  Is it sometimes called other things?

4    A.    The liability ledger is described here in the manual, I

5    correlate with a payment history that the lender would keep

6    and would keep track of any funding of the loan, any

7    payments made, any escrow received, taxes paid, that type of

8    thing.

9         In my terminology, since the majority of the

10   information on the liability ledger relates to payment, I

11   refer to it as a payment history.

12   Q.    Okay.  So that's your own --

13   A.    Yes.

14   Q.    -- phraseology?

15   A.    Yes.

16   Q.    What are lenders in the business of doing, generally?

17   A.    Lenders are generally in the business of loaning money

18   and making their profits by charging interest when they

19   collect the payments on the loans.

20   Q.    And do you, as a certified fraud examiner and a CPA,

21   typically rely on a payment history you've received from the

22   lender as an accurate record of the payments that they've

23   received?

24   A.    I do.

25   Q.    And did you do that in this case?

1    A.    I did.

2    Q.    Similarly, are there other portions -- I believe that's

3    in Exhibit 6, but are there other portions of information

4    you've received from the Association of Certified Fraud

5    Examiners that cause you to believe whether or not bank

6    records are an important source of the information for a

7    Certified Fraud Examiner to rely on in his examination?

8    A.    Bank records are one of the most important parts,

9    especially when we're tracing financial transactions.   I

10   believe that's -- it's on Exhibit 7, page 2, bottom

11   paragraph.

12   Q.    Okay.  And is that consistent with what you testified

13   to this morning, that the first thing that you examined

14   virtually in all cases of potential financial fraud are bank

15   records?

16   A.    Yes.

17   Q.    Similarly, in Exhibit 8 -- what is Exhibit 8?

18   A.    Exhibit 8 is a portion of the course materials I

19   received in regards to the mortgage fraud class that I went

20   to as described this morning.

21   Q.    And does this information set forth in Exhibit 8 relate

22   to the use of servicing records by certified fraud

23   examiners?

24   A.    Yes.

25   Q.    And can you tell us generally what the Association of

1    Certified Fraud Examiners, through this court, has led you

2    to believe is the importance of servicing records?

3    A.    The importance of servicing records is that, again, it

4    will detail the mortgage payments that were made on a

5    particular loan, primarily.

6    Q.    Since we're talking about servicing, one of the things

7    that you've mentioned in your testimony here, and has come

8    up in your proffer as well, is the fact that there can be a

9    servicer, a lender, successor lender, and so on.

10   A.    Yes.

11   Q.    Okay.  And can you describe to the Court how, if at

12   all, the interrelationships among those entities played into

13   your -- the difficulty or ease with which you could find

14   answers you were looking for in this investigation.

15   A.    The difficulty that I had was because many of these

16   loans were outstanding over a period of years, I could start

17   with the original lender who gave the loan an original

18   identification number.  If the loan got sold to a successor

19   lender, that successor lender may give a new identification

20   number to that loan.

21        In some cases, the lender may have allowed a

22   servicer to collect the loan payments and that servicer may

23   refer to that loan under a different identification number.

24   So part of my difficulty was knowing that that could happen

25   and, two, when it did happen, where could I find the

1    successor information?

2            And that's when I started to compile one of the

3    exhibits in my disclosure, to try and keep track of all

4    these different identification numbers.  So when I'm looking

5    at a loan application and I can see a loan identification

6    number for a loan, I could refer to my summary to see, have

7    I matched that identification number to a particular loan,

8    or is that a brand-new loan that I didn't know about?  Or

9    could that be a successor number that I haven't yet

10   identified to a particular loan?

11   Q.   Please look at Exhibit 2.  And, I'm sorry, I don't -- I

12   think we had that one --

13           COURTROOM DEPUTY:  I think I handed that there in

14   the second batch.  Let's see.  Here.

15           THE WITNESS:  Yes.

16   BY MS. KAUFMAN:

17   Q.   Is this -- what is this?

18   A.   This is my summary of the loan identification numbers

19   for my universe of loans.

20   Q.   Was this done all at once or was this a product of

21   ongoing -- your ongoing work in this case?

22   A.   It was ongoing product.

23   Q.   Did the amounts also change from time to time, payment

24   amounts and so on?

25   A.   Payment --

1    Q.    Payment amounts?

2    A.    Payment amounts could definitely change over time.

3    Q.    And would the name of the person collecting the

4    amount -- that amount change?

5    A.    It could.

6    Q.    And would the identification number change as you said?

7    A.    It could.

8    Q.    And sometimes did these identification numbers have

9    prefixes and/or suffixes?

10   A.    Some would, yes.

11   Q.    Meaning what?  Additional numbers at the beginning --

12   A.    Additional numbers at the beginning or at the end, but

13   there was typically a root identification number, if you

14   will.

15   Q.    What is an escrow number?

16   A.    The escrow number is typically the number that the

17   title company will know the loan under when it's closing the

18   loan.  And it would typically be shown primarily on the

19   HUD-1 settlement statement.

20   Q.    Is that number sometimes also listed on other

21   documents?

22   A.    It could, yes.

23   Q.    Is the loan number sometimes listed on, for example, a

24   note or some other document without it saying, quote

25   unquote, loan number?

1    A.    Yes.

2    Q.    And same thing with the escrow number?

3    A.    Yes.

4    Q.    Did you use your training and experience and expertise

5    in sifting through all that to be able to help you identify

6    the loans that you've identified in your opinions?

7    A.    Yes.

8    Q.    Did you obtain deeds of trust for all of the loans in

9    this case early on in the investigation?

10   A.    I don't know if it was early on, but we did obtain the

11   deeds of trust that were recorded with the proper county

12   clerk.

13   Q.    All right.  Did you find that -- by looking at those,

14   that they were recorded at or near the time of the closing?

15   A.    Typically, they were not.

16   Q.    And how much later, typically?

17   A.    Several months to several years.  It varied.

18   Q.    In addition to articulating your opinions in document

19   161 in this case, did you also create a number of summary

20   charts for this case?

21   A.    Yes.

22   Q.    And do you distinguish in your mind the work that you

23   did in creating those summary charts with the work that you

24   did in articulating the opinions that are set forth in the

25   motion in this case?  What's the difference, if any?

1    A.    The summary -- the summary charts that I created -- the

2    summary charts for the bank records, for the bank account

3    documents, I consider to be summary charts that I would

4    typically prepare in a case, but for the comments' column.

5              The other summary charts that I have done here are

6    more summary charts of the opinions that I've reflected in

7    Exhibit 160.

8    Q.    Okay.  How -- let's look at, for example -- and I'm

9    sorry, I don't think I mentioned this, Ms. Glover, 6800.

10   Exhibit 6800.

11             COURTROOM DEPUTY:  Six eight zero zero?

12             MS. KAUFMAN:  Six eight zero zero.

13             THE WITNESS:  Yes.

14   BY MS. KAUFMAN:

15   Q.    What is this?

16   A.    This is my summary chart of the account activity for

17   the Colorado County and Community Title escrow trust account

18   at First American State Bank, account No. 117523.

19   Q.    On this particular summary chart, does this state -- or

20   does this set forth any of your expert opinions?  And if so,

21   where do you -- where do you see them?  And how can you

22   tell?  I'm looking at page 35.

23   A.    Well, there's one example on page -- the statement's in

24   the way -- on page 35.  And it would be line 1744.

25   Q.    And how can you tell by looking at this summary of --

1    is this a summary of activity in this particular account?

2    A.    It is.

3    Q.    And in order to -- aside from this particular expert

4    opinion that's listed here, where do you get the other

5    information and why do you call it a summary?

6    A.    It's a summary because it's a summary of the bank

7    account -- the voluminous bank account records that we

8    received from the bank.  So the statements, the deposit

9    slips, wire transfers, the checks, all that information.

10   The majority of that information would come and be placed on

11   this -- on this chart.

12   Q.    Okay.  And line 1744, is that the line in which you've

13   set forth one of your opinions?

14   A.    It is.

15   Q.    In this case, did this case, as you began to become

16   involved -- whose idea was it, talking about opinion A,

17   group A, whose idea was it for you to perform that analysis

18   and compare and contrast the information in those three

19   areas from -- two areas from the application, the credit

20   report, and the other loans?  Was that your idea or were you

21   instructed to do that?

22   A.    It was my idea.

23   Q.    You testified this morning that it's common for you to

24   look at a loan application first, see if there are false

25   representations made.  And what is the easiest false

1    representation that you can find typically in doing that?

2    A.    Typically it's the bank account balances that are

3    listed on the assets section.   Just because I will have --

4    since I've looked at the bank account records first, that is

5    something that I would immediately be drawn to.

6    Q.    You indicated -- did you indicate this morning that you

7    looked at all of the records that you obtained from the

8    lenders?

9    A.    That we obtained, yes.

10   Q.    And did that include documents that would have been

11   provided to the lenders by potential borrowers?

12   A.    Yes.

13   Q.    If they were in the file?

14   A.    If they were in the loan file, yes.

15   Q.    And did that include, in some cases, bank statements?

16   A.    Yes.

17   Q.    And in this case, for example, did you see such bank

18   statements?

19   A.    I did.

20   Q.    And did you compare those bank statements to the actual

21   bank statements that you got from the lenders?

22   A.    I did.

23   Q.    And did you find discrepancies?

24   A.    I did.

25   Q.    Now, you haven't listed any of that as an expert

1    opinion, correct?

2    A.    Correct.

3    Q.    How qualitatively did the analysis that you did in part

4    A differ from doing that rather routine work that you

5    typically do in finding misrepresentations on applications?

6    A.    The work to form the opinions for topic A was a lot

7    more involved, probably the most involved that I've ever

8    worked, as compared to comparing a bank statement -- two

9    different bank statements and just looking at the numbers,

10   and you can -- the bank statements that were submitted to

11   the lender were altered pretty significantly, in my opinion,

12   that were easy to see.  There wasn't any studying of

13   individual transactions.  It was pretty obvious that they

14   were altered.

15   Q.    And how was the other analysis qualitatively different?

16   A.    The other analysis on its face, items appeared to match

17   up until I started looking at the addresses that were listed

18   for the property pledged.  And that's why keeping a running

19   list of the loans that I was aware of and knew that

20   Saxeborough or Lost Angel were the properties that were

21   pledged as collateral for particular loans, and then being

22   able to match up the identification numbers, it took a lot

23   more steps to go through to provide reasonable assurance to

24   myself that that was something that was misstated.

25   Q.    And, again, is your stated opinion that there's a false

1    statement, or is your stated opinion precisely what is

2    written in document 160, the motion?

3    A.   Yes.

4    Q.   Which is it?  Is your opinion that we intend to offer

5    into evidence --

6    A.   Not that they're misstated, but that the address listed

7    appears to relate to the liability, but in actuality it

8    really is a different loan for Saxeborough or Lost Angel or

9    whatever is described in the opinion.

10   Q.   Let's look at -- you have testified, and it's

11   abundantly clear from the paperwork file, that there are

12   three topics that when we revised our Rule 702 motion, we

13   revised it by topic.  And what -- for what purpose was that

14   reorganized?

15   A.   For ease of the Court to determine the different topics

16   of analysis and types of opinions.

17   Q.   And within each of those topics, did you look further

18   to determine whether, perhaps, there were groups of opinions

19   rather than one opinion, one type of opinion, repeated and

20   repeated?

21   A.   Yes.

22   Q.   And did that happen with topic A?

23   A.   It did.

24   Q.   Let's look at Exhibit 1600.

25        MS. KAUFMAN:  And for counsel's benefit, I can say

1  we're going to look at 1600, 1601, 1602, and 1305.

2          Ms. Glover, may we look at this on the screen?

3          COURTROOM DEPUTY:  I'm sorry?

4          MS. KAUFMAN:  May we look at this on the screen?

5          COURTROOM DEPUTY:  Sure.

6          MS. KAUFMAN:  Thank you.

7          THE COURT:  I'm not interested in looking at

8  documents on a screen.

9          MS. KAUFMAN:  All right.

10          THE COURT:  They're not legible that way.

11          MS. KAUFMAN:  All right.

12  BY MS. KAUFMAN:

13  Q.   Let's look at Exhibit 1600.  Do you have that before

14  you, Ms. Chamberlin?

15  A.   I do.

16  Q.   What is this?

17  A.   This is my summary of opinions regarding the topic A

18  analysis for loan S-15.

19  Q.   Okay.  Now, what I'd like to focus on is your opinion

20  that has been numbered opinion A8a.  Capital A8a.

21  And just for the purpose of this example --

22  A.   That's related to line 1 on Exhibit 1600.

23  Q.   Is Exhibit 1600 something that you created at the end

24  of this whole process of analysis rather than at the

25  beginning?

1    A.   Yes.

2    Q.   Are we looking at it now just to gain bearings as to

3    what -- where this goes?

4    A.   Yes.

5    Q.   So if we're looking at opinion A8a, to which loan

6    application does it apply?

7    A.   It's the loan application for loan S-15, as I've

8    referred to it.

9    Q.   All right.  And did you, for ease of reference, list

10   all of these loan numbers in Exhibit No. 1?

11   A.   Yes.

12   Q.   Is that your index of loan codes, and so if somebody

13   wants to know exactly what S-15 is and so on, they could

14   look at that?

15   A.   Exhibit No. 1, yes.

16   Q.   Okay.  And do you also state that information at the

17   top of each of these summaries?

18   A.   I do.

19   Q.   Okay.  Is this, then, a summary of expert opinions

20   relating to this particular property in group A opinions?

21   A.   Yes.

22   Q.   For opinion A8a, small A, you directed us to a

23   particular line.

24   A.   It would be line No. 1.

25   Q.   All right.  Would you walk us through this by looking

1    at the exhibits that I've called up, beginning with 1601,

2    and explain the process -- first of all, is this -- is the

3    process that you used for this one representative of the

4    process that you used for all of the opinions in which you

5    conclude that particular liability and a particular debt do

6    not relate, in fact, on the property of the real estate

7    owned, but rather to some other property loan?

8    A.    Yes.

9    Q.    Okay.  So let's look at Exhibit 1601.  And could you

10   tell us how you reached this opinion.

11   A.    1601 is the loan application that was in the loan file

12   for loan S-15 that we got from the lender.  On page 2 of

13   this loan application, the first section that I would look

14   at is listed, which would be the liabilities section.  But

15   instead of listing each individual loan, it has a notation,

16   "see addendum."

17   Q.    Where's that?

18   A.    Right underneath the liabilities section, about a third

19   of the way down from the top of the page.

20   Q.    And where is the addendum?

21   A.    That would be pages 5 and 6.

22   Q.    All right.

23   A.    And 7, going on to page 8.  So if we look at page 5,

24   the first liability listed is a liability to Washington

25   Mutual.  It lists the account type as a mortgage.  It lists

1     an account number, which I would refer to as the loan
2     identification number.  It lists an outstanding balance of
3     $401,761 and a monthly payment of $1,857.
4            So the next thing that I would have done was to
5     look at the schedule of real estate owned to see which piece
6     of property this loan is associated with.  And the schedule
7     of real estate owned begins on page 3, but, again, it says,
8     "see addendum."  And the addendum begins on page 8, the
9     bottom third of the page.
10           The first address listed being 790 Magnolia Street
11    in Scottsdale, Arizona, had a mortgage amount of $401,761
12    and a mortgage payment of 1,857.  So based upon the
13    information of the mortgage amount and the mortgage payment
14    for Magnolia is the same as the mortgage amount or the
15    balance in the payment listed for the Washington Mutual
16    liability.  I, therefore, concluded that the Washington
17    Mutual loan is being represented as the loan for Magnolia
18    Street.
19           So the next piece of information that I would have
20    looked at would have been the credit report that was in the
21    loan file.
22    Q.    Exhibit --
23    A.    Which is Exhibit 1602.  This is the credit report for
24    the borrower, Waunita Weingart.  And in this instance, I
25    would go through and try and locate the debt listed on the

1    credit report that would correspond to the same liability.
2    So it would be a matter of looking at the lender name -- the
3    creditor name as it's displayed on the credit report.
4            I would also look at the balance owing column to
5    see if I could locate the same outstanding balance, the
6    401,761.
7            Once I identified a potential debt, which would be
8    on page 9 of the credit report, and it would be the last
9    item on that page, line 50 -- or entry 50, that indicates to
10   me that it's a Washington Mutual debt, the balance owing was
11   401,061.  The monthly payment is listed on the second line
12   over on the far right, has terms equals 36, 360-M-1857, the
13   1857 would be the monthly payment.
14   Q.   Do you know that from your experience in studying these
15   documents --
16   A.   Yes.
17   Q.   -- and your training?
18   A.   The second line also on the far left indicates the
19   account number, 125 606 759 384 27.  That account number is
20   the same account number that's listed in the liabilities
21   section for the Washington Mutual loan.
22           So now that I found those three pieces of
23   information correspond, I continue to look at the credit
24   report.  And what that tells me is this Washington Mutual
25   loan, the date opened was 05-2004, which tells me this

1    Washington Mutual loan occurred in May of '04, and the high

2    credit amount, which is two columns over from the date

3    opened, was $400,000.  So I know the Washington Mutual loan

4    was the loan that was May of '04 for $400,000.

5         I would then go back to my Exhibit 2 where I was

6    compiling this information, and to find out if I had

7    identified a loan for $400,000 to Waunita Weingart in May of

8    '04 that was originally Washington Mutual, or could have

9    been a successor loan, a successor lender.

10        So when I go back to Exhibit 2 -- and Exhibit 2 is

11   in chronological order -- page 2 shows the loans that

12   happened in May of 2004.  And there were two loans, one done

13   on May 6th and one done on May 24th.  Both were to Waun

14   Weingart, but only one was for $400,000.

15        So based upon that information -- and the original

16   lender was Washington Mutual, that the loan identification

17   number off the note is the root identification number that's

18   listed on the credit report and the application and,

19   therefore, I concluded, based upon that information, that

20   the Washington Mutual loan really is S-12 and it's not a

21   loan for 790 Magnolia Street in Scottsdale.

22   Q.   And did you have the loan file for S-12?

23   A.   I did.

24   Q.   And did that loan file have in it a signed document

25   whereby the borrowers promised to pledge collateral, that

1    being Saxeborough, for this loan?

2    A.   It would have had the deed of trust in there.

3    Q.   In this sub -- section A of opinions -- and, again,

4    have you also created a list of all of the opinions by

5    opinion number that fall within this group?

6    A.   Yes.

7    Q.   And would the same analysis apply to all of those?

8    A.   Yes.

9    Q.   Is that set forth at Exhibit 15?

10                COURTROOM DEPUTY:  Do you have 15?

11                MS. KAUFMAN:  14 and 15 should probably be pulled.

12                THE WITNESS:  Yes.

13   BY MS. KAUFMAN:

14   Q.   So looking at -- what is the difference between Exhibit

15   14 and Exhibit 15?

16   A.   Exhibit 14 is just the outline of the topics grouped by

17   opinion.  And Exhibit 15 is that same outline, but with the

18   specific opinion reference number.

19   Q.   So, for example, the opinion we just went through would

20   be listed on Exhibit 15, topics A, group 1, A8a --

21   A.   Correct.

22   Q.   -- correct?

23                And all of those others in that group, you follow

24   the same methodology?

25   A.   Yes.

1    Q.   Same analysis?

2    A.   Yes.

3    Q.   And you applied the data -- you applied the methodology

4    in the same manner to the data?

5    A.   Yes.

6    Q.   Just curiously, on this Exhibit 2 where you had the

7    root number underlined for the loan, if you did a search by

8    the number starting with the prefix, would you be able to

9    find that loan number?  In other words, did having a prefix

10   make it more difficult to find numbers?

11   A.   Having a prefix or a suffix did make it a little bit

12   more difficult.  So I would concentrate on trying to find

13   that root identification number.

14   Q.   Within group topic A, you have another group, the

15   second group of opinions.  The particular outstanding loan

16   was not listed in the liabilities section of the loan

17   application, correct?

18   A.   Yes.

19   Q.   And I just would like to have you look at an example of

20   that.  Let's look at what is identified as opinion A --

21   excuse me, A4g.  Now, can you -- before we get into the

22   details, can you --

23   A.   I'm sorry.  What was that opinion number again?

24   Q.   A4g.  And the exhibits that we will be looking at are

25   1100, 1004, and 1014.

1    A.    I don't think I have those.

2              MS. KAUFMAN:   I think that's the next group, Ms.

3    Glover, on our list.

4              COURTROOM DEPUTY:   Well, they're further down, but

5    that's fine.   You want 1100, 1004, and 1014?

6              MS. KAUFMAN:   Yes.   Yes, please.

7              THE WITNESS:   1100?

8    BY MS. KAUFMAN:

9    Q.    Yes.   What is Exhibit 1100?

10   A.    Exhibit 1100 is my summary chart of my opinions

11   regarding the topic A analysis for loan S-10.

12   Q.    And, again, is this a document that you compiled after

13   you completed the analysis and created the summary of your

14   opinions?

15   A.    Yes.

16   Q.    Can you help us focus on the one that we're going to

17   talk about here, opinion A4g?

18   A.    And that relates to loan S-9.

19   Q.    I believe -- okay.   Can you go through your methodology

20   here and how you applied that methodology to the data that

21   you had.

22   A.    So for this loan, S-10, I knew it was taken out

23   February 19th of '04.   And from my Exhibit 2 where I kept

24   compiling a list of all the outstanding loan -- of all the

25   loans that I was looking at and when they were taken out, as

1    I identified the loans that were listed on the loan

2    application that's in the upper portion of the chart on

3    Exhibit 1100, I would then go to my Exhibit 2 and say, what

4    else had already been taken out?  What other loans had been

5    taken out prior to February 19th of '04?  And were they

6    still outstanding as of February 19th, '04?

7         And I knew whether or not they were outstanding

8    based in part on the payment histories if I had -- if I had

9    them, as well as my work regarding the payments which came

10   later, you know, in seeing monthly payments were continuing

11   to be made.

12        So in this case, I had identified the loans that

13   were on the application, but then in looking in my universe

14   of loans, I saw that loan S-9, which was taken out

15   November 19th, 2003, was still outstanding.  And because it

16   was -- Saxeborough was pledged as collateral for that loan,

17   it should have been listed on the loan application for S-10,

18   and it wasn't, because I had not matched up a liability to

19   S-9.

20   Q.   Did we pull the application for this particular loan

21   S-10?  We did not.

22   A.   No.

23   Q.   Let's look at that.  And that would be Exhibit No. --

24   do you have an exhibit list there, Ms. Chamberlin?

25   A.   I --

1    Q.    Is it --

2    A.    I don't.  It would probably be 1101.

3    Q.    Okay.  1101, please.  Do you have that before you?

4    A.    I do.

5    Q.    And is there a schedule of real estate owned on this

6    application at page 5?

7    A.    There is.  And page 6.

8    Q.    Okay.  Does it list 7766 Saxeborough?

9    A.    It does.

10   Q.    Does it list it more than once?

11   A.    It does not.

12   Q.    Could you tell from your examination of known loan

13   files -- known loans that were outstanding, that, in fact,

14   there was more than that debt on it, the 550,000 listed --

15   excuse me, that's the value -- the 389,968 listed?

16   A.    Say the question again, please.

17   Q.    My question is:  Does this list for Saxeborough

18   Drive -- does it list that as a property owned?

19   A.    It does.

20   Q.    And does it list the amount of mortgages and liens as

21   being 389,968?

22   A.    It does.

23   Q.    Could you tell from your examination of known loans --

24   known loans and from the loan files, that there were other

25   loans outstanding --

```
 1    A.    Yes.

 2    Q.    -- at this time --

 3    A.    Yes.

 4    Q.    -- against that property?

 5    A.    Yes.

 6    Q.    And in particular, this opinion -- in this opinion,

 7    you're saying that a particular loan was not listed at all.

 8    A.    Correct.

 9    Q.    And where does that show up on your summary Exhibit

10    1100?

11    A.    At the very bottom of Exhibit 1100 under the notes

12    section.

13    Q.    Now, this is but one part of the summary for the loan

14    details for S-10, correct?  I mean, we're --

15    A.    Correct.

16    Q.    -- one --

17    A.    This is --

18    Q.    -- line?

19    A.    Topic -- yes.

20    Q.    For this particular opinion?

21    A.    Yes.

22    Q.    I guess my question is:  Can you explain all these

23    other lines in the chart above, 1 through 7?  What is all

24    that where you conclude at the end the conclusion that's

25    either unknown 1, unknown 2, S-4, and so on?  Why is -- how
```

 1   are those different than the one you have in the bottom
 2   here?
 3   A.   Those were the loans that were listed on the credit
 4   report that had appeared to correspond to an address listed
 5   under the schedule of real estate owned and corresponded to
 6   the debt on the credit report.
 7   Q.   So tell me if this is right or wrong:  Are those loan
 8   codes listed in the second to the last column of the box
 9   above, where it says conclusion --
10   A.   Yes.
11   Q.   -- are those conclusions that you drew by applying the
12   same methodology you just described a moment ago for opinion
13   A8a?
14   A.   Yes.
15   Q.   Okay.  And this is different in that -- in what way?
16   A.   That that particular liability was not listed on the
17   loan application in the liabilities section, or listed on
18   the credit report.
19   Q.   Okay.  So have you basically tediously listed as an
20   opinion, your analysis -- your conclusions from analysis for
21   each one of these entries?
22   A.   Yes.
23   Q.   Okay.  And in your Exhibit 15, page 1 --
24   A.   Yes.
25   Q.   -- there's a topic A, group 2 opinions.  And it says

1    the particular outstanding loan was not listed in the

2    liabilities section on the loan application.

3    A.   Yes.

4    Q.   Are all of the opinions listed there, were all of those

5    reached by applying the methodology you've just described

6    for this opinion A4g?

7    A.   Yes.

8    Q.   Okay.  You have also -- we have also pulled in this

9    presentation Exhibit 1004, I believe.

10   A.   Yes.

11   Q.   How does that relate?

12   A.   1004 is the promissory note for loan S-9, the loan that

13   was not listed on the application for S-10.

14   Q.   And what about Exhibit 1014?

15   A.   1014 -- 1014 is a payment history for loan S-9; again,

16   the loan that was not listed on the application for S-10.

17   And this payment history covers the time period of December

18   23d, '03, through May 25, '04.  So during the time frame

19   that con- -- contains the time frame for when S-10 was

20   done.

21   Q.   So what does this show you?

22   A.   So what this shows me is that loan S-9 was an

23   outstanding loan the date that S-10 was applied for.

24          THE COURT:  Ms. Kaufman, do you intend to go

25   through each loan transaction?

1        MS. KAUFMAN:  No.

2        THE COURT:  Okay.

3        MS. KAUFMAN:  I would hope, Your Honor, to -- and

4    consistent with meeting our burden -- of giving examples

5    where there are significant differences in the type of

6    opinion rendered or the application of the methodology,

7    because those are being objected to by the defense.

8        THE COURT:  Well, I understand the objections to

9    pertain to whether there was a methodology, whether the

10   methodology was reliable, and whether it was reliably

11   applied.  I don't understand the objection to be an

12   objection as to the conclusion that was reached by the

13   witness, and, therefore, the witness' conclusion is not of

14   import at this stage.

15       MS. KAUFMAN:  All right.  I'll focus on the

16   methodology and leave off the conclusion.  Okay.  Thank you.

17   BY MS. KAUFMAN:

18   Q.   Let's look, Ms. Chamberlin, at your second group of

19   opinions, those being in topic B.

20   A.   Okay.

21   Q.   Now, in this particular group of opinions, you say the

22   analysis as to whether loan proceeds for each refinancing of

23   Saxeborough and Lost Angel were used to promptly pay off the

24   prior outstanding mortgage as required by the lender.  You

25   apparently limited your stated opinion to one loan that

1    wasn't paid off.

2    A.   Yes.

3    Q.   Okay.  And was that just something you decided to do as

4    opposed to, say, all -- what all loans weren't paid off at

5    that time?

6    A.   Well, it was based upon the HUD-1 and what the lender

7    was directing the title company to pay off.

8    Q.   I guess asking the question another way:  Based on your

9    universe of loans, were you becoming aware, as this

10   investigation proceeded and your analysis proceeded, that

11   although there may be one loan paid off, as you've indicated

12   in this opinion, that there may also be other loans that

13   were not paid off at the time?

14   A.   Yes.  There were other loans that weren't.

15   Q.   And that's my question.  In this group of opinions,

16   you're only focusing on the one that you say the lender

17   required to be paid off as a condition --

18   A.   Correct.

19   Q.   -- of the loan?

20         Okay.  Is that a decision you made just in coming

21   up with these opinions?

22   A.   Yes.

23   Q.   Okay.  In your Exhibit 14, you've described a component

24   opinion 1, component opinion 2, and then final opinions.

25         And what do you mean -- first of all, can you

1   explain to the Court how you came up with the hypothesis in

2   this case that you set forth for opinions B.

3   A.   From doing my work on topic A and knowing that there

4   were several loans that were -- that were not paid off, and

5   that they were being misrepresented on the loan application

6   as to which address they really related to, I wanted to find

7   out that if -- when the loan was funded, did the title

8   company do with the proceeds what they were asked to do?

9         So, in other words, to figure out if a loan had

10  been paid off, because that's the goal in the refinancing, I

11  first had to determine where did the proceeds go, and what

12  loan was supposed to be paid off, to determine was it paid

13  off as required by the lender?

14  Q.   And how did that cause you to articulate what were

15  component opinions 1 and 2?

16  A.   Well, I couldn't determine if the required loan had

17  been paid off until I knew, did the title company get the

18  proceeds?  And what was supposed to be paid off?  So I had

19  to figure out 1 and 2 before I could get to my final

20  opinion.

21  Q.   Okay.  Let's look at an example of the component

22  opinion.  Now, you've -- under component opinion 1, which is

23  the loan proceeds of a particular loan were deposited in a

24  particular bank account.  Can you -- could you tell by

25  looking at the bank account statements what the -- where the

1    deposit was coming from?

2    A.    From the bank records, I could identify the -- in

3    general, we're talking about wires.  There were a few cases

4    of deposits of checks, but in most cases it was wire

5    transfers.  So I could identify who the sender of the wire

6    was, I could tell an amount, a date, and I could tell, based

7    upon my training and experience, that the loan number or

8    escrow number sometimes would be within the wire transfer

9    detail.  So it would give me some indication as to where to

10   start to look, but it would not tell me a particular loan

11   for this piece of property.

12          I had to rely on my compilation of all these loans

13   in order to identify the loan number, if it was listed.

14   Q.    Would a wire say this is the loan number?  Would it

15   identify it, as quote, unquote, loan number?

16   A.    Typically not.  There might be a couple of cases where

17   it did, but in general, no.

18   Q.    Looking at your Exhibit 15 under component opinion 1,

19   you've divided this into three types.

20   A.    Yes.

21   Q.    And why did you do that and what do those types

22   generally represent?

23   A.    The types generally represent the type of data that I

24   used to generate the opinion.  So the type of record that I

25   was looking at.

1    Q.   Okay.  Let's look at what has been called opinion B6a.

2    And for that we will be looking at Exhibits 1312, 1304,

3    6110.  Those three.

4         MR. TAYLOR:  Excuse me, Your Honor, could we hear

5    those exhibits again?

6         THE COURT:  1312, 1304, and 6110.

7         MR. TAYLOR:  Thank you.

8    BY MS. KAUFMAN:

9    Q.   Ms. Chamberlin, does this particular opinion fall

10   within your component opinion 1, type B, where the bank

11   record contained the loan number or part of it?

12   A.   It does.

13   Q.   Tell us first what you looked at in Exhibit 1312.

14   A.   1312 is the wire transfer record from the bank.  And

15   what this indicates to me is that the amount of $405,426 and

16   64 cents was wired in; that the originator, which is line

17   5100, was Washington Mutual Bank.  That the beneficiary was

18   Colorado County and Community Title.

19        And then this wire transfer record gives me two

20   identification numbers:  The first one being under line

21   6,000, org 2B NF info, shows the escrow number 040015 F.

22   Q.   How do you know that's an escrow number?

23   A.   It says "escrow."

24   Q.   Okay.

25   A.   But the root loan number is also under the line --

1   third line from the bottom of the wire that says sender ref,

2   the 067593842.  I know that to be the root identification

3   number of the loan from Exhibit 1304.

4   Q.   And what is 1304?

5   A.   1304 is the HUD-1 settlement statement from the lender

6   records.  And at the top of the HUD-1, kind of the two

7   middle boxes, one box that says file number is the escrow

8   number, 040015 F, and then the next box over is the loan

9   number that has the prefix of five digits but then has the

10   root number 067593842.

11        So, therefore, I concluded that the wire transfer

12   of 405,000 plus were the proceeds for this loan that went to

13   Colorado County and Community Title.

14   Q.   So you were looking at the combination of the bank

15   record and the lender's record?

16   A.   Yes.

17   Q.   If you would -- what is Exhibit 6110?

18   A.   6110 is the bank statement for the Colorado County and

19   Community Title bank account that received the wire shown on

20   page 1 under deposits and additions, the first wire

21   transfer.

22        And there the description says wire FM, meaning

23   from Denver Wholesale.  Which if you look back at Exhibit

24   1312, the Denver Wholesale comes from the originator line.

25   Q.   Was that the lender?

1    A.   The originator is typically the one that should be the

2    lender, but from the HUD-1, the lender was Washington Mutual

3    Bank.  So Denver Wholesale is somehow connected in with

4    Washington Mutual to send the loan.

5    Q.   So how is it that you were able to conclude that this

6    payment relates to the loan identified in the HUD-1,

7    Exhibit 1304, as opposed to something else that connects up

8    with Denver Wholesale?

9    A.   Based upon the escrow number and the root loan number

10   that's listed on the wire transfer matching to the HUD-1.

11   Q.   Do you know from your training and experience that if

12   the -- that if a root loan number has a prefix or suffix, it

13   doesn't change the identity of the loan?

14   A.   It doesn't.

15   Q.   Do you know that from your training and experience?

16   A.   Yes.

17   Q.   In your Exhibit 15, we're now talking about topic B,

18   have you set forth a number of other opinions consistent

19   with your application of the methodology just described?

20   A.   Yes.

21   Q.   Looking at type A, where the lenders' records identify

22   the amount and day of the proceeds from the account in which

23   it was deposited, was that easier or harder for you to

24   figure out what loan it linked up to?

25   A.   Those were easier.

1    Q.    Okay.  And you've listed three opinions there.

2    A.    Yes.

3    Q.    Easier because they had the linkage as illustrated in

4    your type A designation?

5    A.    Yes.  The lender record specifically identified a bank

6    account name, number, bank, amount.

7    Q.    Your type C, how did that differ?

8    A.    Type C would be where I had a bank record that provided

9    little information regarding the identity of the loan, being

10   that I could not -- it didn't necessarily have the loan

11   number listed on the wire record.

12   Q.    Is an example of this B14a?

13   A.    Yes.

14   Q.    Could we look at the following exhibits:  2110, 2103,

15   6924, 6900, 2112?

16         THE COURT:  Perhaps this would be a convenient time

17   to take a mid-afternoon recess.

18         MS. KAUFMAN:  That's fine.

19         THE COURT:  Would this be a good juncture?

20         MS. KAUFMAN:  Yes.

21         THE COURT:  And the court clock is showing 10

22   minutes after 3:00.  Could we reconvene, please, at 3:25.

23   We'll stand in recess until then.

24      (Recess taken 3:11 p.m. to 3:30 p.m.)

25         THE COURT:  Ms. Kaufman, about how much longer do

1    you have?

2         MS. KAUFMAN:  Your Honor, I'd like to go through

3    about five more examples, I think.  Five or six.

4         THE COURT:  Of?

5         MS. KAUFMAN:  Of opinions relating to -- I have,

6    let's see, one opinion relating to topic B where the bank

7    record contained -- excuse me, where the bank records

8    provided little information, that's type C.  I have one

9    relating to the lender requiring that a particular loan be

10   paid off, how she went about identifying that through an

11   example.

12        THE COURT:  And are these examples going to

13   illustrate a methodology that is different than what has

14   already been described?

15        MS. KAUFMAN:  I will evaluate that as I get to each

16   one, because I understand -- I think perhaps the second one,

17   the one I just named, loan identification number, had been

18   provided by the lender.  That would just be testimony.

19        THE COURT:  Well, let me see if I can back up just

20   a little bit here.  What the challenge is here is that

21   there's not a clear methodology, that it's not a reliable

22   methodology, and that it has not been reliably applied.

23   Going through each example is not helpful to me unless we're

24   talking about the methodology.  And the methodology isn't

25   comparing this document to this document.  And that's what

1    you've been doing thus far.

2          The methodology is the analytical process that the

3    witness has used in order to reach the conclusion.  And if

4    she's doing something different in your examples than what

5    she's already described, then I need to hear about it.  But

6    if you're just going to give me examples of where she has

7    done what she's described, I think I understand it.

8          MS. KAUFMAN:  Okay.

9          THE COURT:  So it's -- it's up to you what you want

10   to present, but we don't need to have lots of examples of

11   the same methodology over and over again.

12         MS. KAUFMAN:  I think part of the reasoning that I

13   was coming to this with, was that another of the objections

14   is the methodology is not reliably applied.

15         THE COURT:  Uhm-hum.

16         MS. KAUFMAN:  And I think that Ms. Chamberlin's

17   general methodology is described in her proffer in

18   Exhibit -- or, excuse me, document 161, and that these are

19   examples of how that methodology is applied to the different

20   types of topics and within those different types of topics

21   when different information is available.

22         I guess I'm relying on -- the way we see the case,

23   Your Honor, is that this type of testimony is -- falls

24   within 702 under *Mejia*, in that it is the type of thing that

25   *Mejia* repeatedly said, oh, but if only they had done this,

1    and not what was actually occurred in *Mejia* and that is

2    piece together relatively difficult pieces of information in

3    a meaningful way based on her experience in knowing where to

4    look for it, knowing what the numbers meant, and so on.

5    We're giving examples of that to support that conclusion.

6         THE COURT:  Well, I understand the objection here

7    not to be as broad as you have just articulated it.  It

8    says, objection No. 4:  That the proposed expert witness did

9    not reliably apply said methodology to the facts of this

10   case.  For example, the proposed expert did not adequately

11   account for obvious alternative explanations.

12        I'm understanding that this is not a challenge as

13   to whether she -- the witness compared this entry on this

14   document to this entry on this document, but, instead, that

15   she did not consider how those two entries might not match,

16   or why they might match, based on other features than what

17   was her ultimate conclusion.

18        Let me give you an example:  She testified with

19   regard to her opinions in the type A opinions with regards

20   to particular entries on a financial application.  She

21   identified a loan.  It said it was secured with a mortgage.

22   She looked over to the real estate that was listed in the

23   real estate loan and she tried to figure out which piece of

24   real estate might be the collateral for that particular

25   loan.  That particular collateral was located in Arizona.

1          She looks at the credit report and the credit

2     report identifies the lender, the amount of the loan, the

3     monthly payment.  She knows from her universe of loans that

4     based on the date of the loan as reflected in the credit

5     report, there is a date -- a similar date that Waunita

6     Weingart took out, but it was secured by another property

7     and, therefore, she concluded that the property that she

8     assumed was listed in the real estate section on the

9     financial application -- on the loan application was not the

10    correct property.

11         I did not hear any testimony as to the possibility

12    that there were two loans, two pieces of property.  That the

13    owner of one property might not be the borrower on the loan

14    application.  And that's what I understand this objection to

15    go to is what is the methodology that the witness is using

16    in order to rule out other alternative explanations.  What

17    other alternative explanations are there?  What did she

18    consider?  And how did she rule it out?

19         So that's what I understand the reliable

20    application to be.

21         Now, let me ask the defense, do I understand the

22    objection correctly?

23         MR. TAYLOR:  For John Gallegos, that is certainly

24    part of it, Your Honor.  I haven't heard any testimony about

25    any other -- any consideration of any other explanations for

1    this.  What I've heard is things get matched up by elements

2    of information that are common to different records.  And

3    the rest of the objection is that that simply isn't a

4    methodology --

5              THE COURT:  Well, I'm not talking about that.  I'm

6    talking about reliable application of a methodology at this

7    juncture.

8              MR. TAYLOR:  Right.  And there's no consideration

9    of the reliability of the document she's looking at.

10             THE COURT:  Well, I understand that to be something

11   else, too.  But as to reliable application of the

12   methodology, do I understand correctly what your challenge

13   is?

14             MR. TAYLOR:  Yes.

15             THE COURT:  Okay.  So that's what we're looking at

16   with regard to the reliable application of the methodology,

17   is:  What other alternative explanations were there?  And

18   what was done by the witness to rule out alternative

19   explanations?

20             More examples of how she tied bits of information

21   from one document to another document doesn't address that.

22             MS. KAUFMAN:  Okay.  All right.

23             THE COURT:  So what would you like to present?

24             MS. KAUFMAN:  Well, what I would like to do, then,

25   is go back to part A and ask a few questions that touch on

1    that topic.

2              THE COURT:   Okay.

3    BY MS. KAUFMAN:

4    Q.    Ms. Chamberlin, redirecting your attention to topic A,

5    that is the analysis of the comparison of the different

6    information on the loan application, the schedule of real

7    estate owned.   In addition to comparing the information that

8    you've described in your testimony today, did you also

9    consider the fact that, in fact, one of the borrowers owned

10   the other property which appeared to relate to the liability

11   in the liability section and the debt on the credit report?

12   A.    Yes.

13   Q.    And what did you do to determine whether that was a

14   likely possibility or whether that was true?

15   A.    As I was going through the loan applications for the

16   various loans, I noticed, in addition to Saxeborough and

17   Lost Angel -- which were the loans of my concentration --

18   that I would also see the address 430 East 6th Avenue and

19   7603 California Southwest in Seattle.   Those two pieces of

20   property I knew that Mr. Gallegos had owned -- or did own at

21   the time.   So that is why those two pieces of properties got

22   drawn into my analysis, in addition to Saxeborough and Lost

23   Angel.

24              Regarding the other addresses that were listed,

25   for example, the 790 Magnolia Street, when -- as my

1    Exhibit 2 hadn't been compiled, my whole universe hadn't

2    been identified, I did consider whether or not maybe this is

3    an address that one -- one of -- one or more of the

4    defendants didn't own.  Maybe that really is a loan for that

5    piece of property.

6           So what I did was I would go on to the county

7    records of Scottsdale, Arizona, and attempt to locate that

8    particular address in the county records.  It didn't exist.

9    So to me, that indicated there's a problem there.

10          In your example, Your Honor, where maybe there were

11   two loans at the same time, well, I would expect to see two

12   loans on the credit report with the same information.  I

13   didn't see that.  So I did consider alternate explanations

14   regarding the addresses that were listed on the

15   applications.

16          Regarding, say, topics B and the deposits of the

17   proceeds, because I was looking at a title company bank

18   account, which is in the business of closing loans, I did

19   consider, when I'm looking at the deposits, maybe a deposit

20   doesn't pertain to one of the loans I'm interested in.

21   Maybe it is a legitimate business transaction that they're

22   closing on a loan for somebody else.

23          But the information in the wire records would give

24   me a clue as to whether or not that occurred because the

25   wire records would typically indicate the borrower's name.

1    So if I saw a deposit that is around a date of a loan that

2    I'm interested in, but the wire transfer information

3    indicated it was a different borrower, I wouldn't look into

4    that deposit further.  I would concentrate on those deposits

5    that would indicate to me that it was either a Weingart or

6    Gallegos loan.

7          In -- I'm trying to think of alternative

8    explanations, again, for payments.  The same type of thing

9    crossed my mind as I'm looking at all of these mortgage

10   payments coming out of various -- both personal and business

11   bank accounts, that maybe they are making a mortgage payment

12   on a loan that I'm not aware of.  That maybe it's a mortgage

13   loan for another piece of property that I'm not aware of.

14   Maybe it's a loan for a car, not a mortgage.

15         But through my analysis of matching up the payments

16   and what the monthly payments should have been based upon

17   the payment histories that the lender provided it, or based

18   upon the promissory note and the repayment schedule, I could

19   rule out -- and by matching up the various mortgage

20   payments, there weren't any other mortgage payments left

21   over for me to investigate as to maybe this is a different

22   piece of property.

23         So I feel like I did consider alternative

24   explanations through each one of my topics.

25   Q.   Another question, just to follow up on part A, you say

1    that sometimes when you looked up one of these properties,

2    like Magnolia or -- was another one Diamond Back?  Were they

3    in different cities throughout the country?

4    A.    Different cities, different states.

5    Q.    Okay.  And did you also find some -- that the property

6    existed, but it had never been owned, and wasn't owned at

7    present, by any of the suspects in this case?

8    A.    Yes.

9    Q.    Okay.  And then ultimately did others, in working on

10   the investigation, get the formal records from each of those

11   counties that will establish that?

12   A.    Yes.

13   Q.    And so was your work on that the initial part of that

14   that led to getting the formal sealed records?

15   A.    Yes.

16   Q.    And, again, based on your training and experience, does

17   a loan number, whether it be the loan number or a successor

18   loan number, identify a particular loan?

19   A.    The loan -- the loan identification numbers, although

20   there may be multiple ID numbers for the same loan, they're

21   unique to that loan.  So I would not see another Country

22   Wide loan with loan number 1234 for another loan by Country

23   Wide.  It would be a unique number unto that particular

24   loan.

25   Q.    Topic A, did you consider the possibility that as -- I

1    think you stated that one or more of the suspects actually

2    did own other properties listed on the schedule of real

3    estate owned?

4    A.    Yes.

5    Q.    And are those the California property and the 6th

6    Avenue property that you learned they did own?

7    A.    Yes.

8    Q.    One of them owned?

9    A.    Yes.

10   Q.    Did you then consider whether, however -- I guess, did

11   you consider whether some of those properties listed on the

12   schedule of real estate owned also had more debt than was

13   listed on the real estate owned, not just Lost Angel and

14   Saxeborough?

15   A.    As I was compiling the various loans and pulling in

16   California and 6th Avenue, I did discover that they had

17   similar characteristics to Saxeborough and Lost Angel in

18   that there were multiple loans on those properties that were

19   not paid off, similar to what I was looking at for

20   Saxeborough and Lost Angel.

21         And I knew that, because we ended up getting some

22   loan files and getting the payment histories, as well as my

23   payment analysis, seeing that there were monthly payments

24   being made consistently on those loans as well through the

25   end of the scheme.

1    Q.   Did you consider, as to topic B, component opinion

2    No. 1, that being loan proceeds from a particular loan were

3    deposited into a particular bank account, how many total

4    bank accounts did you look at that were controlled by one or

5    more of these defendants?

6    A.   Bank accounts in total, I think there was 26, 28,

7    something like that.  And then out of those, the ones that

8    actually received proceeds, it was smaller than that.  I

9    don't recall the number off the top of my head, but the bank

10   accounts that either received proceeds, made a payoff on a

11   loan, or made monthly payments on the loan, there were

12   roughly 14 to 15 bank accounts involved.

13   Q.   And every time that you looked at the receipt of

14   proceeds, for example, and you were trying to determine

15   whether these proceeds went into this bank account, did you

16   look at all the other bank accounts that you had found that

17   were controlled by one or more of the suspects?

18   A.   I did.  I would typically concentrate first on --

19   obviously, if Colorado County was the title company that

20   closed the loan, I would look -- first look at Colorado

21   County Title bank accounts to see if the proceeds came in

22   there.

23   Q.   And if they didn't, what did you do?

24   A.   I would look at the other bank accounts that I hadn't

25   looked at, whether they be personal or RET bank accounts, or

1     other business accounts.

2     Q.    And in looking at all that universe of accounts, were

3     you able to identify -- in other words, did you consider

4     that the money went somewhere else altogether?

5     A.    Yes, by looking at all the bank accounts, if I couldn't

6     find it in the one I thought it should have been going to.

7     Q.    And sometimes did the money go into a different

8     account, not the account of the closing agent?  Did the

9     money ever go to a personal account or a different account?

10    A.    I don't believe -- I don't recall if they went into any

11    personal account.  It may have been that the money -- the

12    money may have gone into a -- the correct title company

13    account -- a title -- the correct title company, but a

14    different account that maybe the wire instructions had said

15    to send it.  If -- did -- does that make sense, Your Honor?

16               THE COURT:  It does.

17               THE WITNESS:  Okay.

18    BY MS. KAUFMAN:

19    Q.    So you checked out different accounts.  And based on

20    the universe of accounts that you had at your disposal, were

21    you able to trace all the payments to one of those accounts?

22    A.    Yes.

23    Q.    Taking into account, as you say, that there are many

24    deposits into title company accounts.

25    A.    Yes.

1    Q.    This part of it where the lender required that a

2    particular loan be paid off with the proceeds of the new

3    loan?

4    A.    Yes.

5    Q.    You've testified, I believe, this morning, that you

6    were able to tell the lender name and the amount of the loan

7    to be paid off from the HUD-1 --

8    A.    Correct.

9    Q.    -- is that correct?

10        But that there was information -- some information

11   not on the HUD-1 that was necessary to identify which loan

12   to a particular lender was to be paid off --

13   A.    Correct.

14   Q.    -- is that what you're saying?

15        And so what alternatives did you consider in

16   determining which loan was to be paid off?  What were the

17   things that could have happened?

18   A.    Well, since -- since all of these loans that I was

19   looking at, except for California one and 6th Avenue one,

20   and Lost Angel one were all refinances, I knew that just

21   because of the nature of what a refinancing is, it's

22   refinancing a loan on that particular property.

23        So since there was only one loan listed on the

24   application associated with Lost Angel or Saxeborough, then

25   I knew whatever that loan was -- so in my mind, there really

1    wasn't an alternative as to what was being required to be

2    paid off.  I can't think of an alternative --

3    Q.   Well, could -- okay.  Could it have been any number of

4    loans related to the property being refinanced?

5    A.   But on the loan application there was only one loan --

6    Q.   Right.

7    A.   -- associated with the property being refinanced.

8    Q.   Okay.

9    A.   So that was the loan required to be paid off.

10   Q.   And that was your conclusion.

11   A.   Yes.

12   Q.   Based on what?

13   A.   My training and knowledge of what a refinancing is and

14   what its purpose is.

15   Q.   If a lender is only told about one loan, is that why

16   you concluded that that was the loan, among many

17   possibilities, they required to be paid off?

18   A.   Yes.

19   Q.   Now, the final opinion in your topic B is generally the

20   proceeds of the loan were not used to pay off the prior

21   mortgage designated by the lender to be paid off as a

22   conditional approval of that loan.  Okay?

23        Did you consider what -- by this point, you had

24   traced money into a particular account.  Right?

25   A.   Correct.

1    Q.    And now you were trying to see whether those proceeds

2    were used to pay off those loans?

3    A.    Correct.

4    Q.    Did you consider the possibility that they used other

5    money at their disposal to promptly pay off the loan as

6    required by the lender?

7    A.    I did.

8    Q.    And was that an alternative explanation possibly?

9    A.    Yes.

10   Q.    And did you explore that?

11   A.    I did.

12   Q.    And what did you find?

13   A.    There were no additional payments from another bank

14   account or from another set of proceeds or from savings that

15   paid off the loan.

16   Q.    And in addition to that, did you look at it from the

17   other end to determine whether money from some account in

18   which you were not aware was used to pay off the loan?

19   A.    I did from reviewing the payment histories that had

20   been provided by the lender, as well as my payment work.

21   Because if a loan had been paid off from some other source

22   that I was not aware of, then monthly payments would not

23   have continued to be -- have to be made to the lender on a

24   loan.

25   Q.    So you explored that possibility?

1    A.    Yes.

2    Q.    That they were paid with some money that you weren't

3    aware of?

4    A.    Yes.

5    Q.    And as a byproduct of this, did you observe that

6    certain different loans that you were aware of were being

7    paid off with the proceeds of a particular loan rather than

8    the loan designated by the lender?

9    A.    Either through the payment histories or through the

10   bank records.  And as an example, unknown 1 and 2, which I

11   now know to be loans related to Saxeborough, I discovered

12   those primarily through the bank account records, because I

13   saw the deposit of proceeds at one point in time, and then I

14   saw the payoff at a later point in time.

15          And the loan numbers I was able to match up, that

16   that was, in fact, the proceeds of one and it paid off that

17   one.  So then I could look at my bank account schedules and

18   say when unknown 1, for example, was paid off, the funds

19   used to fund that payoff came from a different loan.

20   Q.    Did you explore the possibility that the proceeds from

21   a particular loan were transferred once more -- or even more

22   than once, and ultimately used to pay off the loan?

23   A.    Yes.

24   Q.    And what did you learn?

25   A.    As I've stated in my opinions under topic B, those

1    loans were not paid off as required by the lender.

2    Q.    Were you also aware of the bankruptcy schedule?

3    A.    Yes.

4    Q.    And what do you know about that?

5    A.    I know that the defendants filed for bankruptcy in

6    Arizona in July of 2009, and that the loans that were listed

7    on their Schedule F of the bankruptcy were all the loans

8    that I had identified on my own as being still outstanding

9    as of the end of our scheme.

10   Q.    The opinions in topic C, which has to do with the

11   payments being made, were you typically able to tell by

12   looking at either only the lender record or the bank record,

13   that a payment -- well, from the bank record that a payment

14   was for a particular loan, and from the lender record that

15   it was to a particular bank?

16   A.    From just looking at one side of the document -- source

17   of documents, no, I could not rely on one type.  I had to

18   look at the two different and compare typically the loan

19   numbers.

20            MS. KAUFMAN:  May I have a moment, Your Honor?

21            May I speak with my cocounsel, please?

22            THE COURT:  I'm sorry?

23            MS. KAUFMAN:  May I speak with Ms. Paluch for a

24   moment?

25            THE COURT:  Sure.

1              MS. KAUFMAN:   Thank you.

2              Thank you.

3    BY MS. KAUFMAN:

4    Q.    I would like to focus on topic C.   And I'm trying to

5    understand, Ms. Chamberlin, with your assistance, looking at

6    trying to link up monthly payments being made on loans that

7    were purportedly paid off by refinancing, you ended up

8    linking -- did you end up linking most of the payments

9    through the nine years that this went on to specific

10   payments out of bank accounts controlled by the defendants?

11   A.    Yes.

12   Q.    Now, did you consider that -- I'm trying to explore the

13   alternatives that you considered in looking at payments --

14   let's look at the payment part from the bank accounts.   All

15   right?

16              Say you saw a payment in a particular amount that

17   appeared to be a mortgage payment.   First of all, what on

18   the bank record would cause you to think that it appeared to

19   be a mortgage payment?

20   A.    Typically there would be a reference as to mortgage, or

21   it would be payable to one of the lenders that I'm familiar

22   with, like Country Wide, Washington Mutual, those kinds of

23   lenders that I'm familiar with based on my experience.

24   Q.    Did you consider the fact that -- did you explore --

25   did you examine each of those withdrawals?

1    A.    Yes.

2    Q.    And did you consider the fact that those were for other

3    things, not loans at all?  The withdrawals?

4    A.    Well, it's hard to not consider a withdrawal when it's

5    listed as a mortgage payment.

6    Q.    All right.  Did you consider the fact that they were

7    for things other than Saxeborough and Lost Angel?

8    A.    Yes.

9    Q.    And, in fact, did you find that, in fact, in some cases

10   that was true?

11   A.    Yes.

12   Q.    And from the other perspective, you were also looking

13   at payment histories, if you had them, on the lender side?

14   A.    Correct.

15   Q.    Did you consider the fact that these payments came from

16   an account not owned by the account -- not owned by the

17   borrower of that loan?

18   A.    Since the payment history would only detail the amount

19   and the date the payment was processed, there was that

20   consideration that it could have come from an account that I

21   wasn't aware of, or from somebody else, not the borrowers.

22        But with my -- with my hypothesis that it's a

23   mortgage payment done by the borrowers, the borrowers are

24   the ones responsible to make the payment, so if -- if I

25   couldn't tie a payment on a payment history to a particular

1    bank account, then that is not considered an expert opinion.

2    It -- in my mind, it would be a summary, because it's simply

3    looking at the payment history.

4    Q.    So any time you only had the record from the lender

5    that a payment was made, but you could not trace it to a

6    particular bank account, fair to say that it's not listed as

7    an expert opinion whatsoever?  That's what you just said?

8    A.    Correct.

9    Q.    It was the linking that you deemed to be an expert

10   opinion?

11   A.    Yes.

12   Q.    Is it fair to say that in -- well, in our supplement to

13   the proffer --

14   A.    Yes.

15   Q.    -- what did you do to create the attachment to that

16   document, which is a chart relating to your opinions in part

17   C?

18   A.    I looked at the documentation that I relied upon for

19   each of the opinions and categorized it according to the

20   type of documentation that I used.

21         So, for example, in column A to the supplement, it

22   was -- where part of the records I relied upon were the

23   payment histories provided by the lender that the payment

24   history was under the original loan identification number

25   and it corresponded to a bank record for a particular

1    mortgage payment.

2    Q.    And in that process when you say, for example, type A

3    opinions, were you able to just simply look at one -- one

4    document from the lender and identify that it was a match?

5    A.    I had to look at two documents.  One from the lender,

6    one from the bank.

7    Q.    In what way did this exercise in identifying -- linking

8    the monthly payments from account to a particular loan,

9    require your training and experience?

10   A.    It would -- when the successor loan identification

11   numbers come into play, being able to look at the bank

12   record and say, this is not -- the information that I'm

13   shown here on the bank record doesn't correlate to any

14   original loan information that I'm aware of.  And then being

15   able to consider that maybe there is a successor lender, in

16   which case I would go back to my loan files and try and find

17   the successor lender identification number so I could link

18   up that particular payment from that account to that

19   particular loan.

20        I also had to consider, as I said, that maybe

21   the -- maybe this lender and ID number that, I'm not

22   familiar with at this point, maybe it is another loan I'm

23   not aware of.  So I did consider those alternatives.

24        MS. KAUFMAN:  Your Honor, I would just note for the

25   record that as -- at this point, the defense has not -- in a

1    way, they have articulated their objections to part C, but

2    in another regard, they have not.  I don't know whether

3    they're going to further clarify their objections to part C

4    at this time.

5         THE COURT:  I have their objections as filed.

6         MS. KAUFMAN:  Okay.

7    BY MS. KAUFMAN:

8    Q.   Ms. Chamberlin, this morning you talked about -- in

9    answering the Court's questions, about always looking first

10   to the bank records and also examining the loan files and

11   other documents from the lenders.  And then this afternoon

12   you've touched on your written proffer of methodology which

13   related specifically to the fraud theory.

14        Can you explain how it is that -- how you -- how

15   you connect the two.  In other words, how does your

16   examination of the bank records and the lenders' records fit

17   into the procedures outlined by the fraud theory, that being

18   creating a hypothesis and testing hypothesis?

19        When you're looking at the bank records and so on,

20   are you creating the hypothesis, testing the hypothesis or

21   how does it fit together?

22   A.   When I'm analyzing the bank records initially and

23   putting things in, I haven't formed a hypothesis yet.  I am

24   gathering information as far as patterns that I might be

25   seeing in the bank records.  Where -- patterns as to where

1   the money might be going, what the source of the deposits

2   are.  But I don't -- I don't relate it to a hypothesis at

3   that point.

4           It really wasn't until I started looking at the

5   loan files to think to myself, how could they get loan after

6   loan and not pay the previous loans off?  And that's when I

7   started to form the hypothesis that I did.

8           Once the loan application analysis was done, that

9   then led me to hypothesize under topic B to say if these

10  were not being paid off, then where -- what was -- where --

11  where did the proceeds go?  Did they end up getting paid off

12  some other way?

13          And then that, in turn -- those two combined led

14  me to, well, if all these loans were outstanding, how did

15  the lenders not know?  Were they making monthly mortgage

16  payments on all these to keep them current?  And that's what

17  led me into topic C.

18          So as the Court reflected this morning, it was kind

19  of a circle effect that brought me to each of the topics.

20  Q.   Were you aware that Agent Donner was seeking from --

21  information from lenders as to whether they had been paid

22  off?

23  A.   Through -- yes, through obtaining the loan files and,

24  in particular, the payment histories.

25  Q.   So this morning when the Court asked you did you go to

1    the lenders and ask for whether they'd been paid off or not,

2    your answer was no.  Was somebody else doing that?

3    A.    Yes.  Agent Donner.

4    Q.    Okay.  And was he informing you that they were not paid

5    off?  Or that they were, as the case may be?  Or was he

6    getting documents?

7    A.    I think he was getting documents and passing them on to

8    me.

9    Q.    And, again, when you say he was getting documents,

10   through what process did we get documents from lenders in

11   this case?

12   A.    Through the grand jury subpoena.

13   Q.    Okay.  So when you say he was getting them, he was

14   requesting a subpoena --

15   A.    Yes.

16   Q.    -- is that what you mean?

17           MS. KAUFMAN:   Okay.  Thank you.  No further

18   questions.  Thank you.

19           THE COURT:   Thank you.  Cross-examination.

20           MR. TAYLOR:   Thank you, Your Honor.

21                     CROSS-EXAMINATION

22   BY MR. TAYLOR:

23   Q.    Good afternoon, Ms. Chamberlin.

24   A.    Good afternoon.

25   Q.    Ms. Chamberlin, I want to focus on the methodology that

1    you applied.

2    A.    Uhm-hum.

3    Q.    In document 161, and the attachments, it states that

4    the methodology that you applied is the methodology that is

5    set forth in the Certified Fraud Examiner's Manual.   True?

6    A.    Correct.

7    Q.    And you testified today that that is the methodology

8    that you applied.

9    A.    Yes.

10   Q.    That methodology, if I can sum it up, starts with a

11   hypothesis -- or, sorry, with a predication?

12   A.    Predication.

13   Q.    And then goes to a hypothesis?

14   A.    Analyze available data.

15   Q.    Before or after you put the hypothesis together?

16   A.    Analyze what you have -- what you have to look at and

17   then create a hypothesis, test the hypothesis, and re --

18   refine or amend the hypothesis.

19   Q.    In attachment 1 to document 161, there are some pages

20   from the manual that don't seem to be included in any of the

21   exhibits that have been tendered to the Court today.   And

22   it's the last couple of pages of that attachment.

23          Do you have document 161 in front of you?

24   A.    I think I have 161, but I did not bring the attachments

25   with me.

1    Q.   I'm going to try to do this the most expeditious way

2    possible.  I'm just going to tell you that I'm looking at

3    the last three pages of attachment 1, which bear the

4    numbers -- page numbers 3 dot 101, 3 dot 401, and 3 dot 805.

5    Have you looked at that attachment when it was submitted to

6    the Court?

7    A.   I did.

8    Q.   In connection with reviewing the articulated

9    methodology; is that correct?

10   A.   Yes.

11   Q.   And signed off on the accuracy and completeness of that

12   methodology; is that correct?

13   A.   Yes.

14   Q.   And in that -- in that methodology -- so those three

15   pages aren't outlined, those are part of your methodology;

16   is that correct?  The last three pages I would talk about.

17   A.   I would have to look at them.

18              MR. TAYLOR:  I'm happy to hand them up if she

19   doesn't have a copy.  If I may.

20              COURTROOM DEPUTY:  Are you marking this as an

21   exhibit?

22              MR. TAYLOR:  No, I just want to make sure they

23   understand what's --

24              THE COURT:  Let's mark it as an exhibit so it's

25   clear for the record what's being reviewed.

1        COURTROOM DEPUTY:  Do you know what the next

2   exhibit number is?

3        MR. TAYLOR:  Probably just mark it Defense

4   Exhibit A.

5        THE WITNESS:  Yes.

6   BY MR. TAYLOR:

7   Q.   Do you recognize those pages?

8   A.   I do recognize them, yes.

9   Q.   And you agree that that's part of your methodology?

10  A.   Yes.

11  Q.   Okay.  And that that was part of attachment 1 that you

12  approved as part of the methodology filed with the Court?

13  A.   Yes.

14  Q.   So I'm trying to understand whose methodology you were

15  actually applying.  Let's start with that.

16       Who was the case agent on this case?

17  A.   Scott Donner with the FBI.

18  Q.   With the FBI.

19  A.   Uhm-hum.

20  Q.   That -- what does that mean?  What was he doing on the

21  case as opposed to what you were doing on the case?

22  A.   He was the FBI agent who was to investigate the aspect

23  of the case and bring the information, gather information,

24  and present the information to the United States Attorney's

25  Office.

144

1    Q.    And the FBI has its own methodology for investigating

2    frauds, correct?

3    A.    I don't know that.

4    Q.    You don't know.  So you -- I take it you also do not

5    know that there is a -- an FBI methodology for investigating

6    mortgage frauds in particular?

7    A.    I was not aware of any methodology that the FBI

8    requires the agents to go by.

9    Q.    Okay.  Don't know whether there is one or isn't one,

10   correct?

11   A.    Correct.

12   Q.    Never saw one.

13   A.    Correct.

14   Q.    Do you know what methodology Agent Donner was applying?

15   A.    I don't.

16   Q.    Did you talk with Agent Donner about the investigative

17   methodology he was applying?

18   A.    No.

19   Q.    You had previously worked at the FBI, correct?

20   A.    I did.

21   Q.    When you worked at the FBI -- and I believe you

22   testified this morning you worked on at least one mortgage

23   fraud case at the FBI; is that correct?

24   A.    I can't remember if it was started when I was at the

25   FBI and completed by the time I turned over -- it was a case

1   that I began at the FBI and continued to work when I came

2   over to the United States Attorney's Office.

3   Q.   All right.  So do you have a specific recollection that

4   you began it at the FBI?

5   A.   I honestly -- I don't remember.  I do recall it was

6   probably -- I don't remember.

7   Q.   Okay.  So I take it in connection with that, you don't

8   remember seeing an FBI methodology for investigating fraud

9   or investigating mortgage fraud?

10   A.   I did not.

11   Q.   Okay.  And just to clear up something from this

12   morning, you said that you -- again, there's confusion about

13   whether you started that at the FBI and finished at the

14   U.S. Attorney's Office when you transferred over in 2000,

15   correct?

16   A.   Correct.

17   Q.   Is it a total of three mortgage fraud cases you've

18   worked on or four?

19   A.   It would be excluding this one --

20   Q.   Excluding this particular case?

21   A.   Excluding this particular case.  There are four that I

22   have worked on.

23   Q.   Okay.  Including the one that may have begun at the

24   FBI?

25   A.   Including that one, yes.

1    Q.    So four prior cases prior to this one.

2    A.    Correct.

3    Q.    And have you testified as an expert in connection with

4    those cases?

5    A.    I have not.

6    Q.    All right.  In either grand jury or trial

7    proceedings?

8          THE COURT:  Counsel, it's not relevant whether

9    she's testified in other proceedings or not.

10         MR. TAYLOR:  Okay.  The reason I'm asking, Your

11   Honor, is to determine whether there was a methodology that

12   she employed in connection with that.

13         THE COURT:  You could ask her that question, but

14   whether she testified or not is not relevant.

15   BY MR. TAYLOR:

16   Q.    Did you -- whether you testified or not, did you form

17   expert opinions using a methodology on those mortgage fraud

18   cases?

19   A.    I did not form expert opinions on -- in any of those

20   cases.

21   Q.    The only -- the only work that you did on those cases,

22   I believe you would -- you would, based on what you said,

23   would qualify as summary testimony as opposed to expert

24   testimony; is that correct?

25   A.    I don't know -- I don't know what it -- my testimony

1    would end up -- would end up being.  Two of the cases never

2    went to trial.

3    Q.    And are they over?

4    A.    They are over.

5    Q.    All right.

6    A.    Or, actually, three of those cases never went to trial

7    and are over or in the process of an appeal.  And then the

8    last one, one defendant has pled and the other one is still

9    a fugitive.

10   Q.    And on those cases, did you apply the methodology that

11   you have testified that you applied here?

12   A.    Those mortgage fraud cases were -- involved straw

13   borrowers, and I would -- I would deem them not to be

14   similar as to this case.

15   Q.    And -- okay.  Thank you.

16         Did you apply the fraud theory methodology that is

17   set forth in the Certified Fraud Examiners Manual in those

18   cases?

19   A.    For that case?

20   Q.    Uhm-hum.

21   A.    I would say yes.

22   Q.    What did you mean you would say yes?

23   A.    Well, it's been a while since I've looked at the case,

24   but my recollection of that case involves misrepresentations

25   made on the loan application, and so I -- I don't recall the

1    specific misrepresentations, but I would have created a

2    hypothesis to prove it wrong or correct in that case, as I

3    did here.

4    Q.    Okay.  But it wasn't the same methodology that you

5    applied in this case because the facts were different?

6    A.    Facts were different, the data was different.

7    Q.    All right.  So the methodology that you applied in this

8    case has never been applied by you in any other case that

9    you have worked on?

10   A.    Correct.

11   Q.    It is a new methodology devised in specific response to

12   the data available to you on this case?

13   A.    It's not a new methodology, as it's part of my CFE

14   manual.  That's been around.  But have I applied that

15   methodology to a similar set of circumstances as in this

16   case?  No, I have not.  This would be the first time.

17   Q.    All right.  I'm not sure I understand your answer.

18   You've said that you have never before applied the

19   methodology in a case that you have applied here, correct?

20   A.    I have applied the methodology, but it's in a different

21   manner because of the different facts in the other cases.

22   Q.    Okay.  I think I understand.  We'll get there.

23         So the methodology prescribed by the Certified

24   Fraud Examiner Manual prescribes that you take several

25   steps, in an over-arching manner.  There's an over-arching

1 methodology, sort of a meta methodology, correct?  And then

2 there's a micro methodology depending on what specific

3 opinions you're trying to come up to.  Would you agree with

4 that?

5 A.   No.

6 Q.   No?

7 A.   No.

8 Q.   All right.  The CFE manual's methodology prescribes

9 that you do -- that you take a number of steps during your

10 investigation, correct?  You interview witnesses, correct?

11 A.   The methodology -- when you say "methodology" to me, I

12 term that to be the fraud theory approach being what I

13 described as far as analyzing the available data, creating

14 the hypothesis, test it, and refine it or amend it.

15 Q.   Well, I'll refer to attachment 1 to document 161, which

16 says that first you start with the interviews, then you

17 start with documents.

18 A.   Correct.

19 Q.   All right.  You didn't follow that methodology in this

20 case, correct?  You conducted no interviews of any

21 witnesses.

22 A.   I've conducted one interview of one witness in this

23 case, but typically I am not the one doing the interviewing;

24 typically it is the case agent that conducts the interview,

25 because it's an FBI case.

1    Q.   And that would be Agent Donner.

2    A.   Correct.

3    Q.   And we've already established that you don't know what

4    methodology he was following.

5    A.   Correct.

6    Q.   You did not speak with him about the methodology you

7    were following.

8    A.   I don't believe I did.

9    Q.   You didn't ask him to conduct any interviews of any

10   witnesses that you otherwise would conduct if you were

11   following the Certified Fraud Examiner methodology?

12   A.   I did not ask him to conduct interviews.

13   Q.   All right.  You interviewed one witness.  Who was that?

14   A.   A Laurie Beck from Speed Pay.

15   Q.   And when was that?

16   A.   August of this year.

17   Q.   Of this year.  After you had already provided us the

18   opinions that you were going to testify about?

19   A.   Correct.

20   Q.   All right.

21   A.   It was after the disclosure.  I don't think it was

22   after -- it might have been around the time that we did the

23   first joint motion of 702.

24   Q.   Okay.  But after the 702 disclosures were privately

25   sent to counsel, without being filed with the Court,

1    correct?

2    A.    I believe so, yes.

3    Q.    All right.  And was that part of your methodology, the

4    Speed Pay --

5    A.    No.

6    Q.    No?  You didn't rely on that in forming the opinions

7    that you testified about here today?

8    A.    I used the Speed Pay records to help confirm what I was

9    already seeing within the bank records and the loan records;

10   in particular, the payment histories.

11   Q.    And my question is:  Did you use the interview that you

12   conducted with that person --

13   A.    With the interview, no.

14   Q.    -- to form the opinions you are testifying about today?

15   A.    I did not.

16   Q.    So in forming the opinions that you testified about

17   here today, you didn't conduct any interviews?

18   A.    Correct.

19   Q.    And you didn't cause any interviews to be conducted by

20   anybody else?

21   A.    Correct.

22   Q.    All right.  You agree, though, that interviewing

23   witnesses is specifically called out as one of the tools and

24   one of the steps by the fraud manual that you had talked

25   about.

1    A.   I would say interviewing is considered a tool.   It's

2    not like a checklist to say do this, then this, then this.

3    It is a tool offered to the CFE to conduct interviews.

4    Q.   All right.   Another tool is obtaining documents,

5    correct?

6    A.   Correct.

7    Q.   And in this case, you obtained bank records, correct?

8    A.   Correct.

9    Q.   You obtained bank records of -- you said several times

10   today, "the suspects" --

11   A.   Yes.

12   Q.   -- correct?

13           And by "the suspects," you mean the people who are

14   indicted in this case?

15   A.   Correct.

16   Q.   And eventually were indicted in this case, correct?

17   A.   Correct.

18   Q.   Did you obtain bank records from any of the lenders?

19   A.   No.

20   Q.   Why didn't you obtain bank records from the lenders?

21   A.   I didn't feel that they would have been helpful because

22   the lender records, based on previous experience, would show

23   a tremendous amount of activity going back and forth.   And I

24   didn't think that they would provide me the information that

25   I needed, that I could -- I could get to from the bank

1   records that I already had.

2   Q.   All right.  So when you testified this morning about

3   payment histories, when the Court was asking you questions

4   about the records that you had in order to come to the

5   conclusions in category C, for example, category C opinions,

6   you testified then -- and I think you elaborated on this

7   this afternoon -- that you had some payment histories from

8   some of the lenders, correct?

9   A.   Correct.

10   Q.   That only, I think, in eight -- eight of the loan

11   files, or the various loans, did you have full payment

12   histories and bank records; is that correct?

13   A.   In those instances, I had both the payment history and

14   a bank record for every single payment for the identified

15   loan.

16   Q.   Okay.

17   A.   I had other payment histories for other loans, but it

18   was not a payment history that covered every payment.

19   Q.   Right.  And so the question is:  You had complete

20   records, payment histories, plus transactional detail,

21   either checks or records of electronic transfers, which

22   accounted for every payment for which you had a record in

23   the defendant's bank records; is that correct?

24   A.   For those -- for those eight or so that were listed.

25   Q.   For those eight of 63 loans; is that correct?

1    A.    Yes.

2    Q.    All right.  With respect to the other loans, the other

3    55 loans, you only had partial payment histories.

4    A.    I either had no payment history --

5    Q.    Right.

6    A.    -- or I had a partial payment history.

7    Q.    Okay.  But no full payment history.

8    A.    I may have had a full payment history, but I didn't

9    lump it in with the other loans because I didn't necessarily

10   have a bank record.  So for -- if I can explain.  I may have

11   a payment history that indicates a payment was made on a

12   particular date and amount, but from the bank record, all I

13   had -- for example, the bank -- the payment was made by a

14   check.  I didn't have a copy of that check.  What I did have

15   was a bank statement saying the check number cleared on this

16   date for this amount.  Okay?

17   Q.    And that's on the defendant's bank records.

18   A.    Correct.

19   Q.    Okay.

20   A.    On the payment history side, I had that same dollar

21   amount being processed at or near the time that the check

22   cleared the bank account.

23   Q.    Okay.

24   A.    Okay?  In most of the cases, the early payments that

25   were made on these loans were done by check.

1    Q.    Okay.

2    A.    I could do one step more to verify in that the note or

3    the payment letter that was signed at closing indicating

4    what the original payment amount was, I could verify that,

5    yes, it's the same dollar amount that should have been paid;

6    I have a payment history that tells me it was paid on this

7    date; and then I have a check in that amount clearing on or

8    about that same processing date.

9    Q.    In the defendant's bank accounts?

10   A.    In the defendant's or in the business accounts.

11   Q.    Either the personal accounts of the defendants or the

12   business accounts where the business is associated with the

13   defendant?

14   A.    Correct.

15   Q.    I guess my question is this:  There seems to be a lot

16   of uncertainty that you are having to go to great lengths to

17   resolve in order to determine whether or not the lenders

18   actually received payment which corresponds to the payments

19   that you're seeing being made from the defendant's accounts.

20   Why not just get the lenders' bank records to identify -- to

21   determine whether or not there is a credit to that account

22   on the same -- at or about the same time for the same

23   amount?

24   A.    Because I felt the payment history indicated to me that

25   a payment was made in that amount on that date.

1    Q.   Okay.  But what about situations -- and it sounds like

2    the vast majority of situations, 55 of 63 loans, where you

3    didn't have either a complete payment history or any payment

4    history?

5             I mean, isn't it true that the entire exercise

6    that you -- that you've gone through with respect to

7    category C opinions, would have been completely unnecessary

8    if you simply had followed the recommendation in the

9    Certified Fraud Examiner's Manual which says, Go get all

10   potentially relevant documents?

11            Isn't it true you wouldn't have had to do any of

12   the category C exercise if you just had gotten the lenders'

13   bank records?

14   A.   I may have had to still go through the same steps

15   because some of these loans were -- some of the payments

16   that were made that were too old that the bank might not

17   have retained the records --

18   Q.   All right.  Let me stop you right there.  Do you know

19   whether any of the banks, any of the lenders, bank account

20   records, no longer existed at the time you were conducting

21   your investigation --

22   A.   I don't know.

23   Q.   Your testimony here today has been that only one of the

24   loans was paid off in --

25   A.   No.

1    Q.    How many loans were paid off in full based on your

2    review?

3    A.    My testimony today is that one loan was paid off

4    correctly as directed by the lender.

5    Q.    Okay.

6    A.    There were other loans that were paid off --

7    Q.    How many?

8    A.    May I look at -- may I look at something?

9    Q.    Just give me a ballpark.  Is it a big number or small

10   number?

11   A.    Eight.  11.  Somewhere around a dozen.

12   Q.    Okay.

13   A.    If that.

14   Q.    So we're talking about the same -- 12, 13 percent of

15   the loans that you actually looked at; do you agree with

16   that?

17   A.    Yes.  About 10 percent, yeah.

18   Q.    Okay.  Does it make sense that financial institutions

19   that have -- that are owed money have gotten rid of bank

20   records showing payments on the accounts that they still

21   have accounts receivable on?

22   A.    When we request a loan file and payment history, we

23   would typically ask for all records related to the payments.

24   What the lenders typically provide us is what they did

25   provide us, just the payment history.  They do not go and

1    provide us copies of their checks that they received from

2    the borrowers.

3    Q.   Okay.  This is what banks typically do when you send

4    them a subpoena for a loan file, correct?

5    A.   We're talking about the lender, not the bank.

6    Q.   Well, it's the lender's bank that you're subpoenaing,

7    right?

8    A.   If I had subpoenaed the lenders' bank and asked for

9    their bank account, I wouldn't know what bank account to ask

10    for necessarily.  And the amount of payments that would be

11    on there would -- I think there was one other case where I

12    did receive bank records for a lender's account, and it was

13    substantial to try and go through and find those.  So I

14    didn't consider getting the lenders' bank records because I

15    felt the bank records that I had of the defendants, in

16    conjunction with the payment histories and the lender

17    records, was sufficient enough to form my opinions.

18    Q.   You said that you did more work on this analysis for

19    this case than you've ever done on any other case, correct?

20    A.   It -- regarding mortgage fraud, yes.

21    Q.   And the reason that you didn't get bank records from

22    the lenders is because it would be easier not to?

23    A.   No.  I felt that I had sufficient information to render

24    my opinion with the documents that I did have.

25    Q.   Okay.  Do you disagree with me that bank records from

1    the lenders' accounts would establish more reliably whether

2    or not they received payment in connection with the loans

3    that they own?

4    A.    No, I think it would be along the same lines as what I

5    was seeing in the defendants' bank account and the payment

6    history.  If the check --

7    Q.    Well --

8    A.    -- if the check cleared the defendants' bank account,

9    and the payment was listed on the payment history.

10   Q.    That's fine for the category of loans where there is a

11   payment history.  And I'm referring to what you have

12   described as category C -- cat -- subcategory A and B loans,

13   right?

14   A.    Correct.

15   Q.    Where there was either a payment history that you could

16   trace to the original lender because there was a loan

17   number, or a successor loan owner that had changed the

18   number but allowed you to trace it back?

19   A.    Correct.

20   Q.    What about -- and by the way --

21   A.    C and D.

22   Q.    -- do you know what percentage of the loans that you

23   were -- or payments that you looked at in category C fall

24   into those categories A and B?

25   A.    I don't.

1    Q.   We have actually attempted to total them up.  And it

2    looks to us as if that accounts for -- that there were 744

3    of your 2,073 opinions that were based on payment histories

4    from the original lender; 423 of your opinions are based on

5    payment histories from a successor lender; leaving, in

6    category C, D, and E, approximately 906 --

7    A.   About half.

8    Q.   -- opinions under category C where there wasn't a

9    payment history.

10   A.   Correct.

11   Q.   Is that about right?  So less than half of the opinions

12   that you render under category C are supported by payment

13   histories.

14        Wouldn't it have been both more reliable and easier

15   to go to the lenders and say, "Send us your bank records

16   that show payments credited to these loans"?

17   A.   And we attempted to do that and they did not provide

18   that.

19   Q.   What did you attempt -- how did you attempt to do that?

20   A.   In the original request for the loan file, we would ask

21   for all payment information regarding these loans.  And what

22   the bank -- then what the lenders will typically provide us

23   are the payment histories.

24   Q.   What was the specific command on the subpoena duces

25   tecum issued to the lenders about what was to be produced?

1    What did it tell them they had to produce under court order?

2    A.    It -- typically -- and it's been a long time since I've

3    looked at one of the grand jury subpoenas -- but we would

4    typically ask for the loan file and all payment information

5    regarding the loans, in the -- for any loan in the name of

6    the defendants.

7    Q.    So the loan file and payment history?

8    A.    Payment information, which would --

9    Q.    Payment information?

10   A.    -- which would include the payment histories.

11   Q.    Does it specifically say, "including payment

12   histories"?

13   A.    I'd have to go back and check.

14   Q.    You don't remember?

15   A.    I don't remember, but I know typically that we would

16   ask for payment information.

17   Q.    Does it specifically include the liability ledgers?

18   A.    It wouldn't say liability ledgers, it would say payment

19   history.

20   Q.    Because you --

21   A.    Or payment ledger, or something -- payment regarding

22   all the payments made on the loans.

23   Q.    Does it -- do the subpoenas actually ask for bank

24   records of the lender?

25   A.    They might.  I would have to look at each one, because

1    it may have been phrased in a way that -- to say all

2    payments on this loan, to include payment histories, checks,

3    of that nature.

4            I don't recall if those subpoenas had that

5    language.

6    Q.   All right.  You certainly didn't ask for that,

7    yourself.  That was left to Agent Donner to do?

8    A.   Yes.

9    Q.   He would draft the subpoena for Ms. Kaufman's approval?

10   A.   Yes.

11   Q.   Ms. Kaufman would approve that subpoena?

12   A.   I assume she did.

13   Q.   You weren't granted -- you weren't asked to review it

14   to see whether you needed anything else?

15   A.   I would typically -- when Agent Donner and I would have

16   communications about loans, it would be typically on the

17   phone to say, "Do you -- do you have a loan file for this

18   loan?"  And he would say no.

19           And I said, "Well, here's the information that I'm

20   aware of.  Here's the approximate date, here's who the

21   lender appears to be, here's the loan number."

22   Q.   So my question was:  You were not given the subpoena

23   duces tecum in draft to the lenders for their records, for

24   your input, for your review for your comments?

25   A.   I don't recall ever doing that.

```
 1    Q.    Ever doing that?

 2    A.    No.

 3    Q.    Okay.  So you basically had no input into what was

 4    asked -- what went into the subpoena in terms of the

 5    request, correct?

 6    A.    Other than saying, "Here's a potential loan," and

 7    giving the information that I had from the bank records,

 8    that was it.  It was never given to me for a review.

 9    Q.    All right.  And you don't know whether the banks

10    actually complied with the subpoena and gave you all the

11    records in the loan file and all records relating to

12    payments made, correct?

13    A.    I -- I don't know that for certain.  I assume they gave

14    us what we asked for.

15    Q.    Based on your training and experience, do you know

16    whether or not lenders keep on the books and records of the

17    lender company, a record of their assets and liabilities?

18    The asset here being the debt that the debtors owe to them.

19    A.    I -- I don't know what the lender maintains as far as

20    their financial records.

21    Q.    You're a certified public accountant.

22    A.    Yes.

23    Q.    You understand that a basic part of accounting --

24    A.    Yes.

25    Q.    -- is that your books have a record of the assets of
```

1    the company?

2    A.   Yes.

3    Q.   Of which a $400,000 loan would be one.

4    A.   Yes.

5    Q.   And there are records of the liabilities of the

6    company, correct?

7    A.   Correct.

8    Q.   Including accounts receivable --

9    A.   Yes.

10   Q.   -- correct?

11          You don't know whether these subpoenas asked those

12   lenders for those records.

13   A.   No, I don't know.

14   Q.   And you never followed up with the bank, having

15   received the records from Ms. Kaufman, is that correct, when

16   they came back on the grand jury subpoena?

17   A.   I would -- I would typically get the lender files

18   through Agent Donner.

19   Q.   All right.  When they came back in response to the

20   subpoena?

21   A.   They would go from Charlie to Ms. Kaufman.  Ms. Kaufman

22   would give them to Mr. Donner.  And then once Mr. Donner was

23   done with whatever he was doing with them, he would give

24   them to me.

25   Q.   I take it there never was an occasion when you looked

1    at the records that you had for a particular loan and

2    concluded that you didn't have a complete payment history

3    and, in response to that, either got on the phone with the

4    bank -- or, I'm sorry, with the lender, to ask them what

5    other records they had concerning payment, like their

6    accounts receivable, like their assets, to determine whether

7    they made complete production under the subpoena?  You never

8    did that?

9    A.    I never did that, but I wouldn't think it would be

10   necessary to get the lenders' accounts receivable for all

11   their loans.

12   Q.    I'm not saying for all their loans.  I'm saying for

13   this loan.

14   A.    To me, if they provided a payment history, then they

15   provided me with what they had for that loan regarding

16   payments received.

17   Q.    And you never did anything to verify that with the

18   bank?

19   A.    With the lender?

20   Q.    I'm sorry, with the lender.  With the lender.  I'm

21   sorry.

22   A.    No.

23   Q.    In spite of the fact that you didn't get complete

24   payment histories in the overwhelming majority of these

25   cases.

1   A.   I don't know that I'd say the overwhelming majority

2   that I didn't get a complete payment history.

3   Q.   Well, you had complete payment histories in only eight

4   of the 63 loans, right?

5   A.   I had a payment -- a complete payment history and a

6   bank record that substantiated every payment for those eight

7   loans.

8   Q.   In how many of the loans did you have a complete

9   payment history?

10  A.   I would have to go back and look.  I don't know off the

11  top of my head.

12  Q.   But you don't disagree with the numbers which I've

13  given you, which is something like a thousand -- or, sorry,

14  900 of your category C opinions are rendered without the

15  benefit of any payment history.

16  A.   Correct.

17  Q.   More than the number of category C opinions where you

18  had a payment history.

19  A.   I don't think it's more.  I think there were 2,073

20  total opinions --

21  Q.   Okay.

22  A.   -- and if 900 of those did not have a payment

23  history.

24  Q.   Actually, I think you're right.  Category C, D, and E,

25  according to our figures, account for about 43 percent don't

1    have a complete payment history.  Does that sound right?

2    A.   Without looking at it, I don't know, but I trust what

3    you have compiled.

4    Q.   So with respect to 43 percent of the opinions you're

5    rendering on category C, you gave up the opportunity to go

6    get the best record of whether or not a payment was received

7    from any of the defendant accounts by simply not opting to

8    go get the records from the lender.

9    A.   I felt that the withdrawal from the defendants' bank

10   records, other than the canceled check from the defendants'

11   bank records, was -- that I could specifically link to a

12   loan was sufficient information to render my opinion.

13   Q.   Is that more reliable than actually just asking the

14   lender whether the lender was paid?

15   A.   Well, whether the lender was paid and from what bank

16   account the payment came from are two different things.

17   Q.   You can -- you can ask the lender for their records of

18   payments, right?

19   A.   In which case, they would give me a payment history,

20   which typically would not indicate what bank account the

21   money came from.

22   Q.   And you can ask the lender to tell you where they

23   received payments for specific loans, correct?  So you can

24   send a subpoena to the lenders' bank instead of to the

25   lender, correct?

1    A.    I potentially could do that if I could identify the

2    bank account from which -- to which the payment was being

3    made.

4    Q.    Well, actually, all you have to do is ask the lender

5    where they were receiving payments from, correct, or where

6    they bank?

7    A.    I don't know that the lender would -- I don't know.

8    Q.    You don't know?

9    A.    I don't know if the lender would provide that

10   information in --

11   Q.    If you served a subpoena, they would have to provide

12   it, right?

13   A.    And if -- we may have done that with the subpoena that

14   we did issue.  But yes, if we --

15   Q.    You don't know whether you did it with a subpoena?

16   A.    I don't recall on the attachment to the subpoena if we

17   specifically requested checks -- copies of their checks or

18   if we said, "Provide all payment information."  I don't know

19   how we broke it down to ask for it.

20   Q.    You don't know the single instance where there was a

21   follow-up subpoena to the lender asking for records of

22   payment from their accounting system, not from the loan

23   file, but from their accounting system, showing what

24   payments have been made on a particular loan?  In other

25   words, not a single instance where that was done?

1    A.    I don't think there was any subpoena like that.

2    Q.    And you're not aware of a single instance where the

3    U.S. Attorney's Office, Agent Donner, you, caused a subpoena

4    to go to the lenders' bank asking for all evidence of

5    transactions, wire transfers, or checks from any of the

6    defendant accounts that you knew about, correct?

7    A.    We did not subpoena the lenders' bank, no.

8    Q.    That could have been done?

9    A.    Potentially.

10   Q.    Do you agree or not that it would be more -- a more

11   reliable method to ask the lender whether they were paid

12   than to guess based on partial records from a lender?

13   A.    I don't think I guessed.  I think I had sufficient

14   information to render those opinions, that the payments were

15   made on each of these loans.

16   Q.    If you went to the lender and subpoenaed those records,

17   you would have actual factual evidence that could be

18   introduced at trial instead of your expert opinion, or at

19   least your -- what's characterized as your expert opinion;

20   do you agree?

21   A.    Repeat the question, please.

22   Q.    If you subpoenaed the lenders for that portion of their

23   accounting records, which showed payments attributable to

24   this account on their books, you would have actual factual

25   evidence as opposed to your offered expert opinion.  Do you

1     agree?

2     A.    I believe that we did subpoena the lenders for their

3     accounting records regarding payments and we got what they

4     gave us.

5              THE COURT:  Mr. Taylor, would you move on, please?

6              MR. TAYLOR:  I will.  All right.

7              May I have just a moment, Your Honor?  Thank you,

8     Your Honor.

9     BY MR. TAYLOR:

10    Q.    The starting point for your category C opinions is all

11    the bank records that were presented to you; is that

12    correct?

13    A.    What do you mean by "starting point"?

14    Q.    That's the first thing you did on this case; you

15    analyzed the lender's records?

16    A.    Correct.

17    Q.    Those were presented to you by Agent Donner?

18    A.    Correct.

19    Q.    That was part of the predication, I think is the word

20    you're using, for your analysis, correct?

21    A.    Correct.

22    Q.    At the time that Agent Donner spoke to you and asked

23    you to review the records, he also told you what his theory

24    was about what had been done, that there was fraud in

25    connection with mortgages taken out by defendants, correct?

1    A.    My recollection of what Agent Donner told me was that

2    the three defendants were borrowers on loans on two pieces

3    of property that were refinances and were not subsequently

4    paid off, and that their title companies were used as the

5    settlement agent in the title company for the closing of

6    many of the loans that he was aware of at that time.

7    Q.    So Agent Donner didn't tell you that they suspected

8    mortgage fraud in connection with that?

9    A.    He may have said mortgage fraud, just -- yes, but as

10   far as particulars that absolutely fraud was involved, no.

11   He wouldn't have said that.

12   Q.    Would Agent Donner have told you that he was

13   investigating violations of federal criminal law?

14   A.    I don't know if he would have phrased it that way, but

15   yes.

16   Q.    From your training and experience, does the FBI, in a

17   case like this, investigate where they don't have -- where

18   they don't suspect there have been violations of criminal

19   law?

20   A.    No, they don't.

21   Q.    Does the U.S. Attorney's Office open a file to conduct

22   an investigation absent suspicion that there's been a

23   violation of a criminal law?

24   A.    No.

25   Q.    Is -- in connection with mortgages obtained by people

1    and alleged violations of criminal law, are there violations

2    involving those that don't involve fraud of some kind, that

3    you're familiar with?

4    A.   Not the kind that I've worked in our section, no.

5    Q.   Okay.  So how likely is it that Agent Donner didn't

6    tell you that he suspected mortgage fraud in this case?

7    A.   He probably did, but I'm -- what I'm saying is that I

8    don't think he provided me details as to how it might have

9    been conducted.

10   Q.   All right.  And at that time, you hadn't formed a

11   hypothesis, you had just been given the bank records to look

12   at.  That's your testimony?

13   A.   Correct.

14   Q.   And your hypothesis after you looked at the bank

15   records was what?

16   A.   My hypothesis was that once I had such information on

17   the bank records, was to then go and look at the loan

18   applications to see what information was in there.  And

19   that's when I started looking and identifying, as I

20   testified today, how I was linking up the liabilities to the

21   scheduled real estate owned to the credit report and --

22   Q.   Okay.  You have -- let me just interrupt you, because

23   I'm not sure that you answered my question.  I asked what

24   your hypothesis was and you said what you did.

25            What was the hypothesis that you had in your head

1    after you looked at the bank records?

2    A.   Well, my first review of the loan files, in particular

3    the loan application, my original hypothesis was I expect to

4    see the following:  That the liabilities would correspond to

5    an address on the schedule of real estate owned, which in

6    turn would correspond to a debt on the credit report.

7    Q.   So --

8    A.   That was my original hypothesis.

9    Q.   How long did it take you to review the bank records?

10   A.   I don't recall how long my initial review of the bank

11   records took.  My recollection is I didn't get -- I didn't

12   have all the accounts at one time.  It was, again, kind of

13   developing the number of loans; that I would analyze one

14   account and that may steer me to a different account, in

15   which case we'd get a subpoena for that account.  So it was

16   kind of an ongoing process.

17   Q.   So your assumption or hypothesis at the time that you

18   --- after you reviewed the bank records, your testimony is

19   that it was not a hypothesis that mortgage fraud had been

20   committed, it was a hypothesis that you would see an absence

21   of fraud based on the loan files; is that what you're

22   saying?

23   A.   My original hypothesis for topic A would have been that

24   no fraud had been committed; that the liabilities -- I

25   shouldn't say that.  That the liabilities corresponded to

1     the schedule of real estate owned.

2     Q.    So at page 3 of document 161, in the paragraph that

3     follows the paragraph reciting what you were told about the

4     refis and about the title company, it states -- it's the

5     second full paragraph on that page -- "Based on this

6     predication, Ms. Chamberlin assumed that mortgage fraud may

7     have been committed by the subjects in connection with their

8     refinancings of their properties on Saxeborough and Lost

9     Angel and that they may have used their title companies to

10    facilitate the fraud."

11          The next sentence says that you first acquired

12    bank account records.

13          That doesn't seem to be consistent with what you

14    said.  What you just said is that your hypothesis, after you

15    reviewed the bank records, was that no fraud was committed.

16    This says that based on the predication alone, you assumed

17    that mortgage fraud was committed.

18    A.    Based upon the predication, I -- the predication being

19    that fraud may have been committed, I then look at the bank

20    accounts to get a sense of what we're dealing with.  It

21    wasn't until I was looking at the loan applications that I

22    applied the methodology -- I don't think I've answered your

23    question.

24    Q.    No, I don't understand it.  I don't understand how you

25    could have it both ways.  You assume that mortgage fraud is

1    committed, but your hypothesis is that it has not been

2    committed.  How can --

3    A.    Because that was -- that is where the starting point of

4    it wasn't committed, was to consider the reverse from what

5    the predication indicated.

6    Q.    So when did you actually start applying the Certified

7    Fraud Examiner here?  At what point in your efforts on this

8    case?

9    A.    From my original analysis of the data available, being

10   the bank records.

11   Q.    So it wasn't at the time that the predication was given

12   to you?

13   A.    The predication gave me a reason to start working the

14   case to begin with.

15   Q.    Well, it says here that you assumed that mortgage fraud

16   may have been committed based on the predication.  Is that

17   wrong?  Is that -- is that statement, that assertion of

18   fact, in document 161, wrong?

19   A.    I wouldn't say that it's wrong, because as a CFE, and

20   working for the entity I do, the only cases we're working is

21   if there is a -- a suspicion that a federal crime has been

22   committed, in this case, wire fraud in connection with

23   mortgage fraud.

24   Q.    So here's what I don't understand, based on that

25   answer.

1    A.    Okay.

2    Q.    I don't understand how you can assume that mortgage

3    fraud may have been committed and have a hypothesis that it

4    wasn't.

5    A.    I wanted --

6    Q.    As -- as inconsistent with the methodology which is

7    spelled out in the CFE manual.

8    A.    It's not inconsistent with the CFE manual in that they

9    require one of the steps to look at is reverse proof that

10   mortgage fraud -- and I -- and I can't articulate it without

11   reviewing it again, but --

12   Q.    Reviewing what again?

13   A.    Reviewing the introduction to the Fraud Examiners

14   Manual, it discusses reverse proof.  I was looking at it in

15   the beginning of:  Maybe mortgage fraud was not committed by

16   forming the first hypothesis that I did.

17   Q.    But having assumed it at the beginning that it was

18   committed?  Like it says here?

19   A.    The assumption, based upon the predication.  And then

20   analyzing what data I had, and then going to the application

21   and making the assumption:  Maybe it hasn't been committed.

22   Let's look at what should have happened in the application,

23   absent fraud.

24   Q.    So that at the time that this case gets assigned to you

25   by the U.S. Attorney's Office, right?  And I assume that

1    assignment comes to you from the section chief of the

2    economic crimes section --

3    A.   My supervisor.

4    Q.   Who is your supervisor?

5    A.   At that time, I believe it would have been Tom

6    O'Rourke.

7    Q.   It's the chief of the economic crime section, the

8    Assistant U.S. Attorney, who's the chief of the section,

9    correct?  That's your supervisor?

10   A.   At that time, yes.

11   Q.   Not Tom O'Rourke then.  It's now Matt Kirsch, correct?

12   A.   Matt Kirsch is not my supervisor, it's Suneeta Hazra,

13   who's the assistant deputy.

14   Q.   At the time this case started, there wasn't an

15   assistant deputy?

16   A.   There was not.

17   Q.   It was the chief of the economic crime section --

18   A.   Yes.

19   Q.   Who at the time --

20            THE COURT:  We're right at 5:00, so when you get to

21   a convenient spot, we probably ought to recess.

22            MR. TAYLOR:  I'll ask one more question and then

23   we'll probably call it good for a day, Your Honor.

24   BY MR. TAYLOR:

25   Q.   Your supervisor at the time is the same supervisor as

1    Ms. Kaufman's supervisor, correct?

2    A.    I believe so.

3    Q.    Chief of the section?

4    A.    Yes.

5            MR. TAYLOR:  That's enough for today, Your Honor.

6            THE COURT:  Thank you.  We are scheduled to

7    continue tomorrow; however, it is unclear as to whether and

8    who we will have as a court reporter.  At this juncture, I

9    can't tell you with any degree of certainty and, therefore,

10   because we are at about 5:00, and it's going to take us a

11   little effort to make sure that we have a court reporter,

12   we'll reconvene at 9:00 and do our best to get a court

13   reporter here.

14           I thank you very much.  You may step down.  I'll

15   see you tomorrow morning at 9:00.  And we'll stand in recess

16   until then.

17           (Proceedings concluded at 5:01 p.m.)

18

19                            **INDEX**

20   Item                                                    PAGE

21   WITNESSES

22       DANA CHAMBERLIN
         Examination by the Court (Continued)            36
23       Direct Examination by Ms. Kaufman                65
         Cross-Examination by Mr. Taylor                 140

24                        GOVERNMENT'S EXHIBITS

25

179

| 1 | EXHIBITS: | Offered | Received |
|---|---|---|---|
| 2 | 6  2012 Intro to | 69 | 69 |
|   | Fraud Examiner's | | |
| 3 | Manual | | |

4

5                          *       *       *       *       *

6                          REPORTER'S CERTIFICATE

7

8       I certify that the foregoing is a correct transcript

9   from the record of proceedings in the above-entitled matter.

10      Dated at Denver, Colorado, this 26th day of December,

11   2012.

12

13

14

15

16                    MARY J. GEORGE, FCRR, CRR, RMR

17

18

19

20

21

22

23

24

25